# UNITED STATES v. R. C. TWAY COAL SALES CO.

## No. 6574.

Circuit Court of Appeals, Sixth Circuit.

Feb. 7, 1935.

F. A. Le Sourd, of Washington, D. C. (T. J. Sparks and Claude Hudgins, both of Louisville, Ky., and Frank J. Wideman, Sewall Key, Andrew D. Sharpe, and Louise Foster, all of Washington, D. C., on the brief), for the United States.

D. V. Hunter, of Washington, D. C., and Joseph Selligman, of Louisville, Ky. (Selligman, Selligman & Goldsmith, of Louisville, Ky., and Miller & Chevalier, of Washington, D. C., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The suit below was brought by the appellee corporation to recover refund of taxes and interest paid for the calendar years 1922 and 1923, which were assessed by the Commissioner of Internal Revenue under section 220, of the Revenue Act of 1921, 42 Stat. 247. From a judgment for the appellee entered by the court upon findings of fact and conclusions of law (trial by jury having been waived by stipulation), the government appeals.

Section 220 provides that when a company is formed or availed of "for the purpose of preventing the imposition of the surtax upon its stockholders" by allowing "its gains and profits to accumulate instead of being divided or distributed" it shall pay 25 per cent. more than its proper tax. It is presumptive evidence of such a purpose that it is "a mere holding company, or that the gains and profits are permitted to accumulate beyond the reasonable needs of the business," provided that the Commissioner shall so certify.

The first ground upon which reversal is urged is that the District Court misconstrued section 220 in holding that before there can be an assessment thereunder there must be both an accumulation of gains and profits beyond the reasonable business needs of the corporation, and a purpose thereby to enable the stockholders to evade the payment of surtaxes on dividends which otherwise would have been distributed. The contention is that where the corporation is formed or availed of for the purpose of avoiding the surtax to its stockholders through the medium of accumulated gains

and profits, such corporation is within the statute even though its surplus is not beyond the reasonable needs of its business. It is the accumulation of surplus plus its interdicted purpose that brings the statute into operation, and its size in relation to business needs is but a circumstance out of which a presumption of improper purpose arises, though such purpose may be shown by pertinent evidence with or without the presumption as an aid. This view is undoubtedly that of the Court of Appeals of the Second Circuit in United Business Corp. v. Commissioner, 62 F.(2d) 754, 755, and may be accepted as sound. The practical application of the interpretation may, however, in most circumstances be of little importance. The condemned purpose in the forming or utilization of corporations described in the section is the avoidance by stockholders of surtaxes. This purpose may be proved unaided by presumption, but the fact that the surplus is not unreasonably large in respect to the needs of the corporation's business is repugnant to the existence of such purpose, and, while not conclusive, must be accepted as substantial evidence in denial of proofs or inferences that it exists.

A construction, however, that the accumulation of surplus, unreasonable in relation to business needs, conditions the operation of the statute rather than the creation of the presumption, does not in this case require reversal, since the court found upon all the relevant evidence that the corporation had not been formed or availed of for the purpose of preventing the imposition of surtaxes upon its stockholders. We need only determine whether such finding is supported by substantial evidence.

The Commissioner in 1927 certified that in his opinion the accumulations of earnings for 1922 and 1923 were unreasonable for the purposes of the plaintiff's business, and exacted for each of those years the additional tax authorized by section 220. Without such certification there is of course no presumption. With it it may arise, but is none the less rebuttable by proof, for the presumption does no more than make the taxpayer "show his hand." United Business Corp. v. Commissioner, supra; New York Life Insurance Co. v. Ross, 30 F.(2d) 80 (C. C. A. 6). Here the taxpayer went forward with his proofs, and assumed the burden of establishing his case. Whether we say that the presumption under these circumstances disappears, or is overcome, is

immaterial, for the question still is whether there was substantial evidence to sustain the findings of the court. Equitable Life Assurance Society v. Sieg, 53 F. (2d) 318 (C. C. A. 6).

The appellee is a Kentucky corporation, organized in 1918 for the purpose of engaging in the mining and selling of coal and related activities. It had an authorized capital stock of $100,000, of which 900 shares, each of par value of $100, were issued; 630 shares to R. C. Tway, its president, 250 shares to his wife, and 10 shares to each of two other stockholders. Its business was originally confined to the buying and selling of coal on commission. It purchased all of the coal of the R. C. Tway Coal Company, a corporation in which R. C. Tway owned 90 per cent. of the stock. It also purchased from other producers. It sold upon 30, 60, and 90 day terms, but was obligated to make monthly payments to the Tway Coal Company. In November of 1920, at the suggestion of a broker that profits could be made in stocks and bonds, the appellee first began its dealings in such securities. It was not intended at the time to continue the practice long, but the enterprise proving profitable, it was continued from that time to the year 1931, and became a very extensive and substantial part of the company's operations. All purchases of securities were made by R. C. Tway in his own name, and they remained in his name until sold. It was explained that this was done to facilitate transfers. The purchases and sales were, however, recorded upon the appellee's books, all interest, dividends, and profits received by Tway were turned over to the appellee and returned by it as income taxable as to interest and profits, nontaxable as to dividends. The funds withdrawn for the purchase of securities were charged by the appellee to an account carried on its books as "R. C. Tway, special." Sometimes Tway advanced his own money, in which case he was credited upon the company's books. At other times Tway borrowed money from the bank, and the taxpayer would make proper entries to reflect these transactions. During 1922 the monthly average of securities carried on the taxpayer's books amounted to $217,942, and during 1923 the average was $473,024.

As its president Tway received from the appellee in 1922 a salary of $6,000, and a bonus of $6,000. For 1923 his salary was $12,000 and his bonus $3,000. In addition to these sums he frequently withdrew large

sums of money for his personal use, and these were charged to him as overdrafts. While he had been in the habit of overdrawing from the time the company was organized, the overdrafts grew very rapidly in 1922 and 1923, amounting in round numbers to more than $150,000 in the former year and more than $200,000 in the latter year, and they increased thereafter until in 1930 they were over $461,000. From time to time Tway made payments on his overdrafts, sometimes by cash, sometimes by transferring credits that he had with the Tway Coal Company, and by having himself credited with the salary or bonuses due him. Meanwhile the coal business of the company had grown. In 1922 its sales were $570,000, and in 1923, $539,000. Its indebtedness to the Tway Coal Company also grew. At the end of 1922 it was $283,000, and at the end of 1923, $396,000. By the end of 1931 the total indebtedness of the appellee to the Tway Coal Company was $679,000.

In 1922 and 1923 the taxpayer paid dividends of 20 per cent. on its capital stock. The dividend for 1922 was 35 per cent. of earnings, and the dividend for 1923, 30 per cent. of earnings. At the end of 1922 the ratio of appellee's quick assets to its liabilities was 1.31, and at the end of 1923, 1.34. By excluding Tway's indebtedness and treating it as if paid on the appellee's bank loans, the ratios were increased to 1.43 for 1922, and to 1.58 for 1923. It was shown that the requirement of Federal Reserve Banks for commercial paper subject to rediscount was a ratio of quick assets to liabilities of two for one, and that the appellee's notes in these years would have been undesirable for credit purposes. The appellee introduced expert opinion evidence that for the years 1918 to 1923, inclusive, the excess of its accounts receivable for coal over its combined capital and surplus reflected an inflated condition, and that there was no accumulation of surplus during that period beyond the reasonable needs of its business whether the business was held to include stock dealings or merely the coal sales business.

Tway had substantial personal income, reporting for 1922 a net income of $46,000, and for 1923 a net income of approximately $40,000. A revenue agent undertook to make a computation of the amount of surtaxes Tway would have been obliged to pay had the stock tradings been done by him individually and not by the corporation. His computation purported to show that the government would have received from

Tway individually an additional tax of $13,679 in 1922, and $12,046 in 1923. This computation is attacked on the ground that it included no estimate of the reduction in the appellee's tax which would have resulted from a transfer of this activity, on the ground that without the stock transactions the profits from the company's business would not have permitted the payment of salary and bonus to Tway, nor the declaration of $18,000 in dividends for each of the years involved, and on the further ground that no consideration was given to the fact that Tway, to finance the trading, individually would have incurred bank loans with an interest charge of $13,000 in 1922, and $28,000 in 1923.

The appellee presented in evidence a tabulation referred to as Exhibit 8, compiled from its balance sheets for the period 1918 to 1931, inclusive, and from it made an analysis, challenged neither in argument nor brief, that the dividends it paid during these years bore a high percentage not only to capital, but to accumulated surplus; that its dividend distributions were in excess of nontaxable income; that its total taxes paid amounted to over 86 per cent. of its taxable income, and to more than 25 per cent. of its net income for the period from all sources. Based upon this evidence, and the inferences to be drawn therefrom, the court made the findings indicated, and we are asked to reverse on the ground that there was no substantial evidence to overcome the presumption of an improper use of the corporation, and that the evidence affirmatively disclosed a transparent purpose in such use to enable stockholders to escape surtaxes.

That the corporation was not originally formed for any condemned purpose is conceded, and that it had a legitimate coal business which continued through the taxable years and for many years thereafter is not challenged. Likewise unassailed is the fact that from 1918 to November, 1920, the company made profits and accumulated surplus without distributing dividends, and was during this period not availed of for the purpose condemned by section 220. To now discover the hidden purpose in the operations of the corporation, the Commissioner is forced to rely on the transactions in securities begun in 1920, the fact that these were not within the company's powers under its charter, an inference that it did not deal at arm's length with the Tway Coal Company and was under no obligation to make prompt or any payment to that company for its coal commitments, and that Tway's overdrafts were withdrawals from surplus which Tway never expected to repay and which should have been distributed to him as dividends. These inferences were rejected by the District Judge, and we are unable to say from this record upon a consideration of all of the evidence, and the reasonable implications therefrom, that there was wanting substantial evidence to sustain his findings.

■ That the appellee was not authorized to deal in securities is material only as it may warrant an inference that there was an unlawful utilization of the company by its stockholders. The corporation was organized under Kentucky law, and the ultra vires character of its acts cannot be here attacked. Besides, the gains and profits which furnish the basis for the tax here involved were substantially the result of the activities now condemned. Article 352 of Regulation 62, promulgated under the Revenue Act of 1921, expressly provides that the business of a corporation is not limited to that which it has previously carried on, but that in general includes any line of business which it may legitimately undertake. The word "legitimately" is stressed by the appellant, but in respect to the relation between the taxpayer and the government, and that is all we are called upon to decide, there was nothing illegitimate in the transactions except as they may, if they do, show a purpose to aid the stockholders in the evasion of surtaxes. That this is so is demonstrated by the subsequent provision of article 352 that "Investment by a corporation of its income in stock and securities of another corporation is not without anything further to be regarded as employment of the income in its business," and by the language of article 353 of Regulation 62, that: "The nature of the investment of gains and profits is immaterial if they are not in fact needed in the business."

■ The District Judge concluded that the taxpayer was a bona fide corporation, and was not a mere dummy for the coal company. We cannot say that this conclusion was unwarranted by the evidence. Although Tway had controlling interests in both corporations, each of them had minority stockholders with substantial interests. That the coal company did not press the sales company for prompt payment of its obligations is important, but not conclusive. Tway had a controlling interest in both companies, but there was no certainty that the exigencies of the coal company's business

might not compel it at any time to press for immediate payment, or that such payment could not be enforced at the instance of the latter's minority stockholders or creditors.

■ There is next the matter of Tway's extensive overdrafts. Had the sums been withdrawn from the treasury of the corporation we might well say, as did the court in United Business Corporation v. Commissioner, supra, "These loans are incompatible with a purpose to strengthen the financial position of the petitioner, but entirely accord with a desire to get the equivalent of his dividends under another guise." But this was not the real nature of the overdrafts. Substantially coincident with withdrawals were bank loans made by the corporation in amounts equal or in excess of the withdrawals. This would indicate that what actually was done was a borrowing of money by Tway from the banks through the corporation, or the loaning of the corporation's credit to Tway. However this may be criticized as discordant to sound business practice, it does not conclusively establish a purpose to evade the payment of surtaxes by the stockholders,

■ Lastly there is presented an analysis of the evidence, persuasive to the District Judge and not successfully met here, that if the stock transactions had been treated as the individual transactions of Tway, they would not in the light of all the evidence have resulted in additional taxes to the government. The situation here differs in many substantial respects from that involved in United Business Corporation v. Commissioner, supra, and that in Williams Investment Co. v. United States (Ct. Cl.) 3 F. Supp. 225. In each of the cases cited the corporation was clearly a dummy corporation, taking over substantially all of the assets of its principal stockholder, and having no other substantial activity than to administer such assets. There were disclosed in each case circumstances which made the purpose of the incorporation transparent. That is not the case here. This case differs also in these respects: In the Second Circuit Court case the appeal was from a determination of the Board of Tax Appeals in favor of the Commissioner, with all of the required inferences supporting the determination, and the Court of Claims case was an original hearing on the facts there involved. Here we have an appeal from a judgment of the District Court for the taxpayer, wherein upon accepted principles the judgment must stand unless we find it un-

supported by substantial evidence or the necessary result of an erroneous application of the law, and we find neither.

The judgment below is affirmed.