**WORLD PUB. CO. v. UNITED STATES.**

No. 3571.

Circuit Court of Appeals.
Tenth Circuit.
July 15, 1948.

Rehearing Denied Aug. 26, 1948.

PHILLIPS, Circuit Judge, dissenting.

Byron V. Boone, of Tulsa, Okl. (Dickson M. Saunders, of Tulsa Okl., on the brief), for appellant.

Melva Graney, of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., Sewall Key, Robert N. Anderson and Lester L. Gibson, Sp. Assts. to the Atty. Gen., and Whit Y. Mauzy, U. S. Atty., of Tulsa, Okl., on the brief), for appellee.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

Section 102 (a) of the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 102 (a), imposes an additional tax upon a corporation formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation through the medium of permitting earnings or profits to accumulate instead of being divided or distributed; and Section 102 (c), 26 U.S.C.A.Int.Rev. Code, § 102(c), provides that the fact that earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax on shareholders unless the corporation shall prove to the contrary by a clear preponderance of the evidence.

The Commissioner of Internal Revenue assessed additional taxes against the World Publishing Company, herein called the taxpayer, under the above Section for the years 1942 and 1943. The tax was paid, and a timely claim for a refund thereof was denied. A suit for its recovery was thereupon filed in the United States District Court for the Northern District of Oklahoma. The taxpayer has appealed from an adverse judgment.

The taxpayer, a corporation, publishing the Tulsa World, a daily newspaper in Tulsa, Oklahoma, was organized in 1906 with an original capital of $25,000.00. Through subsequent increases, its capital stock, as of December 31, 1943, stood at $1,000,000.00, consisting of 10,000 shares. Eugene Lorton, the president, owns 9,997 of these shares; his wife, Maud Lorton, owns one share; F. O. Larson, an employee, owns one share; and N. G. Henthorne, an employee, owns the remaining share. These parties have been the directors of the taxpayer since 1917.

The trial court made comprehensive findings of fact and conclusions of law. See World Publishing Company v. United States, D.C., 72 F.Supp. 886, 889. The trial court applied correct principles of law. Thus the court said: "The touchstone of liability under Sec. 102 is the purpose behind the accumulation of the income and not the consequence of the accumulation." The trial court correctly pointed out that the tax may be imposed, even though the accumulation is not unreasonably large, and under proper conditions may not be imposed although there is accumulated more than is reasonably necessary for business needs. The court also recognized that, while the Commissioner's determination is presumptively correct and casts upon the taxpayer the burden of offering evidence in opposition thereto, once such evidence is presented the presumption of correctness disappears and the question then is whether under all the evidence the taxpayer has sustained the burden placed upon him by the applicable law. Our decision then turns upon whether the finding by the trial court that the taxpayer accumulated earnings beyond the reasonable needs of the business finds support in the evidence, and if so, whether the taxpayer has sustained the burden which Section 102 (c) then places upon it to overcome the effect thereof.

As in all such cases, decided cases are not decisive and have comparative value only. In footnote number one,[1] we have assembled a list of cases in which a finding under

1 United Business Corp. v. C. I. R., 19 B.T.A. 809; Id., 2 Cir., 62 F.2d 754; Chicago Stock Yards Co. v. C. I. R., 41 B.T.A. 590; Id., 1 Cir., 129 F.2d 937; 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086; Trico Products Co. v. C. I. R., 46 B.T.A. 346; Id., 2 Cir., 137 F.2d 424; Whitney Chain & Mfg. Co. v. C. I. R., 3 T. C. 1109; Id., 2 Cir., 149 F.2d 936; Semagraph Co. v. C. I. R., 4 Cir., 152 F.2d 62; Helvering v. Nat. Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346;

somewhat related facts that the corporation was availed of for the purpose of preventing the imposition of the tax was sustained; in footnote two,[2] we have assembled a list of cases which on somewhat related facts have reached a contrary conclusion. For obvious reasons, no analysis of these cases will be attempted in this opinion. The applicable principles of law are clear and in the end the decision in this case must rest upon its own peculiar facts and circumstances.

The taxpayer occupies an enviable financial status.[3] Thus it will be seen that in 1941, the net earnings and profits were $12,636.93, and the earned surplus was $562,521.98. In 1942, the net earnings had risen to $80,540.28, and the surplus was $643,062.26. In 1943, the net earnings increased to $96,564.21, and the earned surplus to $739,626.47. The total assets had increased from $1,570,166.29 in 1941, to $1,-595,883.13 in 1942.

The taxpayer's paper grew from a small paper with a circulation of 7,000 to a present daily circulation of 70,000 and a Sunday circulation of 110,000. In 1917, it constructed a five-story building and installed large presses. In 1927, it added four stories to its building. The presses installed in 1917 were used presses and were reconditioned in 1927. On December 12, 1939, the directors set up a reserve of $250,000.00 for the purchase of new printing presses and the acquisition of a lot and building suitable for installing such presses. In 1940, the taxpayer purchased land adjacent to its building for $60,000.00, and announced that a new building would be erected. In July, 1941, a corporation under the name of the Newspaper Printing Corporation was formed. One-half of its stock was issued to the taxpayer and the other half to the Tulsa Tribune Company, publisher of the Tulsa Tribune, a competing paper in the City of Tulsa. From that time on, the Printing Corporation printed both papers, using taxpayer's mechanical plant, and the Tribune moved its office into the taxpayer's building.

It had been the settled practice of taxpayer throughout its history to finance its expansion and its mechanical equipment from earnings. The only loan ever executed by it was one of $50,000.00, in 1927, made to complete the additional four stories to its building.

At the meeting of the Board of Directors on December 21, 1942, a resolution was adopted setting aside an additional $150,-000.00 for presses and accessory equipment, and $100,000.00 for the construction of the new building, and authorizing the President to proceed with plans for the purchase of new equipment. The war ensued and the purchase of the presses and the construction of the building were temporarily rendered impossible.

Under the arrangement with the Tribune, it was agreed that the Tribune was to pay one-half of the cost of the presses and accessory equipment, but there was some doubt about its ability to meet this commitment and it was perhaps necessary that taxpayer be prepared to advance the full cost of the presses and accessory equipment. At the end of 1942, the estimated cost of the building was $150,000.00, and the anticipated minimum cost of new presses and accessory equipment was $350,-000.00.

---

McCutchin Drilling Co. v. C. I. R., 5 Cir., 143 F.2d 480; J. M. Perry & Co. v. C. I. R., 9 Cir., 120 F.2d 123; W. H. Gunlocke Chair Co. v. C. I. R., 2 Cir., 145 F.2d 791; Almours Securities, Inc., v. C. I. R., 5 Cir., 91 F.2d 427; William C. DeMille Productions, Inc., v. C. I. R., 30 B. T.A. 826; Wilson Bros. & Co. v. C. I. R., 9 Cir., 124 F.2d 606.

2 Cecil B. DeMille Productions v. C. I. R., 31 B.T.A. 1161; Id., 9 Cir., 90 F.2d 12; Universal Steel Co. v. C. I. R., 5 T. C. 627; General Smelting Co. v. C. I. R., 4 T.C. 313; Dill Manufacturing Co. v. C. I. R., 39 B.T.A. 1023; L. R. Teeple Co.

v. C. I. R., 47 B.T.A. 270; United States v. R. C. Tway Coal Sales Co., 6 Cir., 75 F.2d 336.

| 3 Year | Net Earnings and Profits | Earned Surplus |
|---|---|---|
| 1934 | $49,154.16 | $488,176.20 |
| 1935 | 19,871.07 | 488,047.27 |
| 1936 | 34,238.10 | 502,285.37 |
| 1937 | 18,250.89 | 520,536.26 |
| 1938 | 37,005.52 | 557,541.78 |
| 1939 | 18,826.42 | 556,368.20 |
| 1940 | 35,916.85 | 574,285.05 |
| 1941 | 12,636.93 | 562,521.98 |
| 1942 | 80,540.28 | 643,062.26 |
| 1943 | 96,564.21 | 739,626.47 |

██ The trial court's findings that the accumulation of the 1942 and 1943 surplus profits was in excess of the reasonable needs of the business, and that the taxpayer had failed to overcome the statutory presumption arising therefrom, are binding upon us if they find support in the record. Whether the accumulated reserves exceeded the reasonable needs of the business cannot be determined from a consideration of a single factor. It is necessary to consider and view all of the facts and circumstances in the light of the setting of the taxpayer in question. The factors which the court considered in reaching its conclusion are set out concisely and clearly in its detailed findings of fact as reported in 72 F.Supp. 886, and we concur therein. No useful purpose would be served by repeating in detail what is so clearly stated in the court's findings. It is significant that the accumulated earned surplus upon the taxpayer's books as of December, 1941, was greater than the estimated minimum cost of the new presses, accessory equipment and of the building, as also is the fact that the Tulsa Tribune Company was chargeable with one-half of the cost of the presses and accessory equipment. While there was evidence that the Tulsa Tribune Company was not presently able to meet its one-half of this obligation and that the taxpayer would perhaps be required to advance such share of the cost, the Tulsa Tribune Company's liability for its share of such costs is nevertheless pertinent in considering whether the reserves accumulated by the taxpayer were beyond the reasonable needs of its business. It is agreed that at the time these reserves were set up, the contemplated improvements could not be made on account of the war. No one knew when they would be made. It was reasonable to assume that a number of years would ensue. During this time the financial status of the Tulsa Tribune might well be expected to improve and the prosperous condition of the taxpayer to continue; and further earnings could, no doubt, be expected.

██ The minutes of the Directors' meeting of December 21, 1942, and other testimony upon the possibility of a diminution of profits was offered to establish the reasonableness of the reserves in question. But, if, as pointed out by the court, no further profits would be required because the reserves already exceeded the estimated cost of the contemplated improvements, such testimony has very little probative value. At most, it is but one of the factors to be considered. The court also pointed out that since the arrangement between the two publishing companies, taxpayer's profits had greatly increased notwithstanding high war time taxes. While it is not required that the reserves be spent in the year in which they are created, so long as there is a present need for the expenditure,[4] the fact that they could not be spent for a number of years during which additional earnings might be expected, in the light of taxpayer's financial history, is a relevant factor to be considered. All this, as well as the other factors which are set out in the trial court's findings, reasonably tend to support the court's finding that the accumulation of the profits of 1942 and 1943 was in excess of the reasonable needs of the business.

██ The only remaining question is whether the taxpayer met the burden which the statute places upon it to overcome the presumption that it was availed of for the prohibited purposes. Such presumption arises by virtue of a finding that it accumulated profits beyond the reasonable needs of its business. Taxpayer must then negative such purpose by a clear preponderance of the evidence. Such purpose need not be the sole purpose behind the accumulation. It is sufficient if it is one of the determining purposes. We think that the trial court's finding that it did not meet the requirement of the statute finds support in the record and is, therefore, binding on us. In all such cases as this, no single factor can be pointed to as controlling. A correct answer can be reached only in considering all of the facts and circumstances of the particular business under consideration and of the owner or owners of such business. When we consider the setting of taxpayer in its particular

---

4 See cases cited in footnotes one and two.

field of endeavor, it presents a bright picture. It had grown from an original investment of $25,000.00, to a corporation having assets of $1,595,883.13. Even during the depression years, it had enjoyed substantial profits. There was nothing in the picture to indicate that these profits would not continue or even increase. In addition to this, we have, for all practical purposes, a one-man corporation. Eugene Lorton owned all but three of the 10,000 shares of stock. He receives 99.97% of all ernings distributed as dividends. If the earnings for 1942 and 1943 had been distributed to the stockholders, his surtaxes would have been increased in the amount of $69,520.35. All of these facts and circumstances tend to support the conclusions of the court that the corporation was availed of for the purpose of preventing the imposition of surtax upon its shareholders.

Affirmed.

PHILLIPS, Circuit Judge (dissenting).

The World Publishing Company[1] is an Oklahoma corporation. It was organized in 1906, with an original capital stock of the par value of $25,000. Through subsequent increases, as of December 31, 1943, its issued capital stock consisted of 10,000 shares of the par value of $1,000,000. The stockholders of the corporation and the shares owned by each are: Eugene Lorton, 9,997 shares; his wife, Maud Lorton, one share; F. O. Larson, one share; and N. G. Henthorne, one share. Its directors, since 1917, have been the stockholders named above.

The World publishes a newspaper under the name of the Tulsa World. When Lorton became associated with the newspaper, its circulation was 7,000. Its present daily circulation is 70,000, and its Sunday circulation, 110,000. Through the years, the City of Tulsa has grown and as the newspaper circulation increased, the World expanded its mechanical facilities. In 1917, it constructed a five-story building and installed large presses. In 1927, it added four stories to its building. The presses installed in 1917 were used presses and they were reconditioned in 1917 and again in 1927. At a directors' meeting held on December 12, 1939, it was reported that the presses were quite old, could only be operated at about 50 per cent of capacity and would not serve the needs of the World much longer, and it was recommended that a reserve fund be set aside for the purchase of a new press. Thereupon, a motion was adopted to the effect that $250,000 be set aside in a reserve fund for the purchase of a new press and accessory equipment, and the acquisition and construction of a lot and the construction of a building. The building was necessary to accommodate and house the new press. In 1940, the World purchased land adjacent to its building for $60,000 and announced to the public that a building would be erected thereon as a new mechanical home for the World.

In July, 1941, a corporation under the name of the Newspaper Printing Corporation[2] was formed. One-half of the stock in the Printing Corporation was issued to the World and one-half to the Tulsa Tribune Publishing Company, publisher of the Tulsa Tribune, another Tulsa newspaper. From that time on, the Printing Corporation printed both papers, using the mechanical plant of the World, and the Tribune Publishing Company moved its offices into the World's building. The increased load on the presses and facilities under such arrangement made it necessary to have a portion of the printing of the Sunday edition of the papers done outside the state.

At the time of the formation of the Printing Corporation, the World and the Tribune Publishing Company issued a joint statement to the effect that a building would be erected on the site acquired by the World as the new mechanical home of both papers.

With the exception of a loan for $50,000, made in 1927 to complete the additional four stories to its building, it had been the settled practice of the World throughout its history to finance needed building accommodations and mechanical equipment from earnings.

---

[1] Hereinafter called the World.

[2] Hereinafter called the Printing Corporation.

At a meeting of the Board of Directors of the World on December 21, 1942, Lorton, President of the World, reported that the Printing Corporation had been formed as a part of a long-range program of improvement and expansion; that the "through-put" of newspapers through the presses had more than doubled and had resulted in an "unsound functional operating position"; that it was imperative that a new press be purchased and installed and that a new building be constructed to house it "at the earliest practicable date," and that he estimated the minimum cost of the new press at $350,000, and the new building at $150,000. Those estimates in the light of future increase in costs were not merely conservative. They were too low. Thereupon, a resolution was adopted setting aside an additional $150,000 for a press and accessory equipment and $100,000 for the construction of the new building, and authorizing the President of the World to proceed with the plans to purchase a new press and accessory equipment and to construct the new building at the earliest practical date. However, the War ensued and the purchase of the press and accessory equipment and the construction of the building were temporarily rendered impossible.

It should be noted that, while the Tribune Publishing Company was to advance one-half of the cost of the press and accessory equipment, there was much doubt that it would be financially able to meet its commitment, and it was necessary for the World to be prepared to advance full cost of the press and accessory equipment.

In 1944, the World entered into a contract for the acquisition of a new press and accessory equipment. That contract was canceled. On May 25, 1945, the World entered into a contract with Hoe & Company for the new press and accessory equipment, and made a down payment of $10,000. The World obligated itself to pay the full cost of such press and accessory equipment. The estimated cost of the new press and accessory equipment in May, 1945, was $636,489.38. The contract, however, contained an escalator clause, under which actual cost was to be computed on cost at time of delivery. The cost will be substantially in excess of the above figure.

An estimate furnished the World on August 18, 1945, by H. R. Lohman Company, of Tulsa, fixed the cost of the building at $300,000 and dismantling a building on the lot at $1600. Thereafter, a contract for the construction of the building was let on a cost plus basis. The cost will be greatly in excess of $300,000. Thus, it will be seen that the estimated cost of the press and accessory equipment and the new building in 1945 had increased to an aggregate of $938,089.38.

At the end of 1942, the World had quick assets, consisting of cash, stocks, and bonds, of $631,252.57, and current liabilities of $67,600.78, leaving an excess of $563,651.79 of quick assets over current liabilities. At the end of 1943, the World had quick assets of $859,099.53, and current liabilities of $187,837.93, leaving an excess of $671,261.60 of quick assets over current liabilities.

The World had dividends in the years 1934 to 1941, inclusive, and in 1944 and 1945.

In the years 1942 and 1943, the World set aside its net earnings, after taxes, for the expansion program and did not pay any dividends.

The Commissioner determined the net income of the World for the year 1942 to be $133,026.43, subject to a Federal income tax, not including the surtax on undistributed profits under § 102 of the Internal Revenue Code, of $52,595.84. The Commissioner determined that the balance of $80,430.59 was subject under § 102 to a surtax of $22,118.41. The Commissioner determined the net income of the World for the year 1943 to be $247,351.18, subject to an aggregate income tax and surtax of $176,353.74, not including the surtax on undistributed profits under § 102. The Commissioner determined that the balance of $70,997.44 was subject under § 102 to a surtax of $19,524.30.

Mr. Lorton and Mr. Henthorne testified that the World withheld distribution of dividends in 1942 and 1943, in order to have funds available to finance the expansion

program and not to avoid the imposition of a surtax upon its shareholders.

Had the World distributed as dividends in 1942 the $80,430.59, held by the Commissioner to be taxable under § 102, its quick assets at the end of 1942 would have been $483,221.20, or less than the then grossly inadequate estimate of the cost of the new building and the new press and accessory equipment, leaving no liquid funds for working capital. It is obvious that the reserve set aside at the end of 1942 was not in excess of the reasonable needs of the business of the World.

The excess of quick assets over current liabilities at the end of 1943 was $671,261.-60. Viewed in the light of the earlier estimate of the cost of the new press, accessory equipment, and building, it was not necessary to withhold the distribution of dividends in the amount of $70,997.44. But, we know that by the end of 1943, costs had greatly increased and it is obvious from what it did, that the World revised upward its estimate of the cost of the press, accessory equipment, and building at the end of 1943. By May, 1945, the estimated cost of the press and accessory equipment was $636,489.38, and by August, 1945, the estimated cost of the building was $301,600. Clearly, the addition of $70,997.44 to the reserve at the end of 1943 was needed to meet justly anticipated increases in costs. In fact, it now appears that the reserves were substantially below · the cost of the new press, accessory equipment, and the building, even if the Tribune Publishing Company should pay half of the cost of the press and accessory equipment, which is unlikely.

When the arrangement entered into with the Tribune Publishing Company was negotiated, $60,000 was advanced to the Printing Corporation by the World and the Tribune Publishing Company. No further advances were required. After the first six months, the Printing Corporation operated at substantial profits which were distributed monthly to the World and the Tribune Publishing Company, the Printing Corporation being a mere printing agency of the World and the Tribune Publishing Company.

The question is whether or not ·the World was availed of for the purpose of preventing the imposition of surtax upon its shareholders through the medium of the permitted earnings or profits, instead of being distributed as dividends. Section 102(c) provides that the fact that earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders, unless the corporation by the clear preponderance of the evidence shall prove to the contrary. The trial court found that the World has not met that burden. The findings of the trial court indicated that it placed strong reliance on the fact that the earned surplus of the World in 1941, 1942, and 1943 was in excess of the December, 1942, estimate of the cost of the new press and accessory equipment, and the building, even if the obligation of the Tribune Publishing Company to bear one-half of the cost of the press and accessory equipment should not be met. The trial court also stressed heavily the fact that the expansion program lay in the indefinite post-war future.

I cannot agree with the fact that the press and accessory equipment could not be immediately purchased and the fact that the building could not be constructed until the cessation of the War were pertinent considerations. The presses were old and could only be operated at 50 per cent of capacity. The load of the presses was increased when the arrangement was made to print both newspapers in the World plant. The fact that it was necessary for the World to acquire a new press and accessory equipment and to construct a new building in which to house them at the earliest possible date cannot be doubted. It was imperative that the World be in a position to act quickly when it became possible to purchase a new press and accessory equipment and construct the building. Surely, a business enterprise, with obsolete and badly worn equipment, might, during the War period, legitimately set aside a reserve fund to replace that equipment when available, and to construct the building necessary to house such equipment. To do so would be ordinary business prudence.

Undoubtedly, the World could have paid its earnings out in dividends and later borrowed, from Mr. Lorton, the money needed to purchase the press and accessory equipment and construct the building, but it was under no legal obligation to follow that course. It had the legal right to pursue the policy it had followed consistently throughout its history.

Moreover, I think the trial court erred in giving consideration to earned surplus. The cost of the new press and accessory equipment and the building would have had to be paid out of quick assets, not out of earned surplus, and as I have shown above, the quick assets in 1942 and 1943 were not in excess of a reasonable estimate of the cost of the new press and accessory equipment and the building when the reserves were increased in 1942 and 1943.

The argument is made that dividends of $47,000 and $45,000 were distributed in 1945 and 1946, respectively. The World could not determine, with certainty, that it would be able to make large earnings in 1945 and 1946. Newsprint was scarce. It was rationed severely. Advertising space had to be greatly curtailed. There was a short period when the World was unable to print any advertising whatever. It seems to me it was altogether reasonable for the World to set aside funds on hand to meet its imperative expansion program and it was not required to run the hazard of obtaining that necessary reserve from uncertain future earnings.

Aside from the fact that had dividends been declared in 1942 and 1943, the income tax liability of Mr. Lorton would have been greatly increased, it seems to me there is nothing in this record to justify the conclusion of the trial court. It is my opinion that, under the undisputed facts, the dividends accumulated were not beyond the reasonable needs of the business of the World, and that the World was not availed of for the purpose of preventing the imposition of surtax upon its shareholders. In support of the views herein expressed see cases cited below.[3]

For the reasons indicated, I would reverse and remand, with instructions to enter judgment for the refunds claimed.

---

[3] Kennedy Nameplate Co., 47 T.C. 523, P-H. BTA-T.C. Memo. Dec. 1947, Par. 47,150; Howard Flint Ink Co., 42 B.T.A.-T.C. 1019, P.-H. BTA-T.C. Memo. Dec. 1942, Par. 42,410; General Smelting Co. v. Commissioner, 4 T. C. 313, 323, 324; Dill Mfg. Co. v. Commissioner, 39 B. T. A. 1023, 1031-1033; William C. DeMille Productions, Inc., v. Commissioner, 30 B. T. A. 826, 830; Universal Steel Co. v. Commissioner, 5 T. C. 627, 637, 638; L. R. Teeple Co. v. Commissioner, 47 B.T. A. 270, 278, 279.