FENCO, INC., a body corporate

v.

UNITED STATES of America.

Civ. No. 14506.

United States District Court
D. Maryland.

Oct. 9, 1964.

P. McEvoy Cromwell and William H. Gorman, II, Baltimore, Md. (Hilary W. Gans, Baltimore, Md., on the brief), for plaintiff.

John M. Hammerman and Moshe Schuldinger, Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., C. Moxley Featherston and David A. Wilson, Jr., Dept. of Justice, Washington, D. C., and Thomas J. Kenney, U. S. Atty., Baltimore, Md., on the brief), for defendant.

THOMSEN, Chief Judge.

This is an action to recover income taxes assessed and paid for the taxable years ended April 30, 1958 and April 30, 1959. The question at issue is whether the taxpayer, Fenco, Inc. (Fenco), was availed of during those years for the purpose of avoiding income tax with respect to its shareholders (particularly Foster T. Fenton, who with his wife owned 95% of its stock) by permitting earnings and profits to accumulate instead of being distributed. The case was tried before the Court without a jury.

### The Statutes and Issues

Sec. 531 of the Internal Revenue Code of 1954 imposes an "accumulated earnings tax" on every corporation described in sec. 532, at the rate of 27½% of the accumulated taxable income not in excess of $100,000.

Sec. 532 provides in pertinent part:

"(a) *General rule.*—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) [1] formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

The government concedes that Fenco was not "formed" for the purpose specified in sec. 532(a); but the government contends that during the fiscal years ended April 30, 1958 and 1959, Fenco was "availed of" for the purpose of avoiding the income tax with respect to its shareholders by permitting its earnings and profits to accumulate instead of being distributed.

Sec. 533, headed *"Evidence of purpose to avoid income tax"* provides:

"(a) *Unreasonable accumulation determinative of purpose.*—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.

"(b) *Holding or investment company.*—The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders."

Sec. 537 provides: "For purposes of this part, the term 'reasonable needs of the business' includes the reasonably anticipated needs of the business."

The government concedes that Fenco was not a mere holding or investment company. It contends, however, (I) that the earnings and profits of Fenco were permitted to accumulate beyond the reasonable needs of the business; and (II) that Fenco failed to prove by a preponderance of the evidence that such accumulations were not made for the purpose of avoiding the income tax with respect to its stockholders.

---

1. The exception is not important in this case.

*Facts*

Most of the historical facts and figures are stipulated. They are summarized here. The inferences to be drawn from them will be set out below under the heading "Discussion".

The G. & F. Realty Company was incorporated in Maryland in 1936. Foster T. Fenton (Fenton) and his wife received 50% of the capital stock and Harry E. Gilbert and his wife received the remaining 50% in exchange for the land and improvements known as 2401 and 2411 N. Charles Street, in Baltimore City.

The Maryland State Department of Health occupied 2411 N. Charles Street under a lease from some time before 1926 until June 30, 1959. Chesapeake Cadillac Company (Chesapeake Cadillac), which was owned equally by the Fentons and the Gilberts, leased 2401 N. Charles Street from G. & F. Realty during the years 1936–1947, except for a short period from 1942 to 1944.

Disputes between Fenton and Gilbert came to a head in 1947, and Fenton arranged to buy out Gilbert's interest in Chesapeake Cadillac and G. & F. Realty Company. In order to accomplish this Chesapeake Cadillac borrowed $350,000 from the Provident Savings Bank. To provide more collateral for the loan, G. & F. Realty was merged into Chesapeake Cadillac, passing to it assets consisting of the two Charles Street properties and about $6,000 in cash. The Gilberts' stock interest in the merged company was then redeemed by it.

At the end of 1947 Fenton and his wife owned 4,500 shares of its stock out of 4,750 shares outstanding. Hilary W. Gans, their attorney, and W. Bladen Lowndes, both of whom were directors of Chesapeake Cadillac, owned 150 shares and 100 shares respectively.

During the period 1947–1953 Chesapeake Cadillac acquired two parcels of unimproved real estate: one at York Road and Susquehanna Avenue, Towson, and the other at Reisterstown Road and Glengyle Avenue, Baltimore. A building was constructed at York Road and Susquehanna Avenue, which was once occupied by Chesapeake Cadillac, and later leased to another automobile agency.

In 1953 General Motors Corporation complained that Chesapeake Cadillac's agency accounting was being complicated by its real estate holdings. Accordingly, Fenco was incorporated on October 28, 1953, as a non-taxable spin-off from Chesapeake Cadillac. Upon its incorporation, Fenco acquired the following assets from Chesapeake Cadillac: 2401 N. Charles Street, the Chesapeake Cadillac showroom; 2411 N. Charles Street, which was then improved by the Department of Health building in front and a service building occupied by Chesapeake Cadillac in the rear; York Road and Susquehanna Avenue; Reisterstown Road and Glengyle Avenue;[2] cash in the amount of $78,321.58; instalment notes in the amount of $304,390.60; and other securities in the amount of $210,602.33.

At the time of its incorporation, Fenco had no liabilities. Its assets and net worth amounted to approximately $990,000, of which $629,000 were current assets. The stock of Fenco was distributed to stockholders of Chesapeake Cadillac in proportion to their ownership of stock in the latter company, Fenton and his wife receiving 81,000 shares, Lowndes 1,800 shares and Gans 2,700 shares.

In 1954 Fenco purchased the property on the southwest corner of Maryland Avenue and 25th Street, occupied by an abandoned church and rectory. The buildings were razed within a year. Fenco engaged an architect to prepare plans for a building of from two to six stories, estimated to cost from $250,000 to $750,000, which could be rented to one or more tenants; but Fenco did nothing toward the construction of the building pending the acquisition of suitable tenants. No suitable tenant was ever found and the property was sold in June 1959 for $95,000.

In 1957 Fenco bought the property 210 West 29th Street for $53,000, renovated

2. In August 1956, the Reisterstown Road property was sold by Fenco for $85,000.

it at a cost of about $4,500 and leased it to General Electric Supply Company. At about the same time Chesapeake Cadillac leased from Bob Fleigh, Inc., with an option to purchase for $300,000, the adjoining premises at the corner of Remington Avenue, known as 242 West 29th Street, intending to use the property for its service operations. Subsequent actions with respect to the latter property will be set out below under "Discussion I, Item (6)".

Fenco knew as early as 1954 that the Department of Health was not going to renew its lease of 2411 N. Charles Street, and the Department of Health vacated the premises on June 30, 1959. The building was torn down in 1960, and the front of the lot has since been used as a parking lot. The building in the rear is still occupied by Chesapeake Cadillac. The problems and activities with respect to this property in 1957–1959 will be set out below under "Discussion I, Item (5)".

The balance sheets of Fenco immediately after its incorporation and on dates relevant to the taxable years in question here are as follows:

| | Nov. 1, 1953 | April 30, 1957 | April 30, 1958 | April 30, 1959 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash | | $ 249,436.00 | $ 263,251.00 | $ 67,712.00 |
| Accounts Receivable | $110,170.77 | | 64,625.00 | |
| Instalment Notes | 304,390.60 | | | 110,000.00 |
| Securities | 215,058.00 | 533,508.00 | 470,708.00 | 668,946.00 |
| Interest Receivable | | 1,785.00 | 2,980.00 | 2,853.00 |
| Total Current | $629,619.37 | $ 784,729.00 | $ 801,564.00 | $ 849,511.00 |
| Mortgage Receivable | | 72,250.00 | 63,750.00 | 55,250.00 |
| Fixed Assets: | | | | |
| Land | 192,906.46 | 215,394.00 | 226,894.00 | 226,894.00 |
| Buildings | 310,486.55 | 314,719.00 | 359,847.00 | 359,847.00 |
| Machinery [less] Depreciation | 142,225.19 | 172,103.00 | 180,924.00 | 190,440.00 |
| Total | $361,167.82 | $ 358,010.00 | $ 405,817.00 | $ 396,301.00 |
| Prepaid Expense: | | | | |
| Construction in progress (architects' fees) | | 11,126.00 | 11,126.00 | 11,126.00 |
| Taxes & Insur. etc. | | 3,821.00 | 4,745.00 | 5,078.00 |
| Bond premium | | 893.00 | 1,033.00 | 987.00 |
| Total | | 15,840.00 | 16,904.00 | 17,191.00 |
| Total Assets | $990,787.19 | $1,230,829.00 | $1,288,035.00 | $1,318,253.00 |

|  | Nov. 1, 1953 | April 30, 1957 | April 30, 1958 | April 30, 1959 |
|---|---|---|---|---|
| **LIABILITIES** | | | | |
| **Current:** | | | | |
| Accounts Payable | | | 541.00 | 540.00 |
| Accrued Expense | | 2,842.00 | 2,911.00 | 3,080.00 |
| Income Taxes | | 57,493.00 | 61,105.00 | 59,523.00 |
| Total | | $ 60,335.00 | $ 64,557.00 | $ 63,143.00 |
| **Deferred Income** | | | | |
| (GMAC Notes) | 4,455.67 | 22,920.00 | 19,647.00 | 19,295.00 |
| Total Liabilities | $ 4,455.67 | $ 83,255.00 | $ 84,204.00 | $ 82,438.00 |
| **NET WORTH** | | | | |
| Capital Stock | 855,000.00 | 855,000.00 | 855,000.00 | 855,000.00 |
| Paid in Surplus | 131,331.52 | 131,332.00 | 131,332.00 | 131,332.00 |
| Earned Surplus | | 161,242.00 | 217,499.00 | 275,583.00 |
| Treasury Stock | | | | [ 26,100.00] |
| Total | $986,331.52 | $1,147,574.00 | $1,203,831.00 | $1,235,815.00 |
| Total Liabilities & Net Worth | 990,787.19 | 1,230,829.00 | 1,288,035.00 | 1,318,253.00 |
| Working Capital | $629,619.00 | $ 724,394.00 | $ 737,007.00 | $ 786,368.00 |

The current assets of $629,619.37 were transferred to the taxpayer on its formation for the purpose of being used in the real estate business.

The earned surplus of the taxpayer, which was accumulated and not distributed, grew in the following manner:

| | |
|---|---|
| April 30, 1954 | $ 16,452.61 |
| April 30, 1955 | 57,339.52 |
| April 30, 1956 | 105,385.39 |
| April 30, 1957 | 161,242.00 |
| April 30, 1958 | 217,499.00 |
| April 30, 1959 | 275,583.00 |

The net taxable income, the non-taxable income, the income taxes paid and the dividends paid by the taxpayer are as follows:

| Fiscal Year Ending | Net Taxable Income | Non-Taxable Income | Federal Income Taxes Paid | Dividends Paid |
|---|---|---|---|---|
| April 30, 1954 | 23,503.73 | | | |
| April 30, 1955 | 87,081.30 | 2,115.63 | Not in evidence | 8,550.00 |
| April 30, 1956 | 98,248.80 | 3,689.95 | Not in evidence | 8,550.00 |
| April 30, 1957 | 113,871.00 | 3,440.00 | Not in evidence | 8,550.00 |
| April 30, 1958 | 118,390.00 | 4,305.00 | 56,006.10 | 10,687.00 |
| April 30, 1959 | 115,713.00 | 7,236.00 | 54,658.07 | 10,462.00 |

The directors of Fenco from May 1, 1957, to April 30, 1959 were: Fenton, Gans, Lowndes, who was then president of Fidelity-Baltimore National Bank and is now president of two banks and two savings and loan associations in West Virginia, Frank W. Wrightson, president and chairman of Provident Savings Bank, and two officers of Chesapeake Cadillac.

In May 1957 Fenco invested $25,000 in Fenco Auto Lease, Inc., which was engaged in the business of leasing Cadillac automobiles. At the same time Fenco invested $5,000 in Fenlease, Inc., a concern engaged in the business of renting automobiles other than Cadillacs. These concerns were merged in April 1959.

In December 1959, after the end of the second taxable year in question, Fenco purchased 71 acres of land for $240,000. It has spent little money thereon since. The evidence does not show that this purchase was contemplated during the taxable years in question.

On September 8, 1958, Fenco bought from Lowndes his 1,800 shares in that company for $26,000. This left outstanding 81,000 shares held by Fenton and his wife and 2,700 shares held by Gans.

Fenton reported a taxable income of $85,000 in 1958, and $97,000 in 1959, with a resulting tax of $42,000 in 1958, and $50,000 in 1959. His top brackets were 69% and 72% respectively.

On December 31, 1957, Chesapeake Cadillac had a net worth of about $841,000, which was increased by $34,000 in 1958 and $79,000 in 1959. It paid no dividends.

### Discussion

#### I.

Were the earnings and profits of Fenco, during the taxable years ended April 30,

1958 and April 30, 1959, permitted to accumulate beyond the reasonable needs of the business, including the reasonably anticipated needs of the business?

The Commissioner's findings of fact are presumptively correct and the burden of overcoming them rests on the taxpayer suing to recover alleged excessive tax payments.[3] Thus, Fenco has the burden of showing that during the years in question its earnings and profits were not accumulated beyond the reasonable needs of the business. Motor Fuel Carriers, Inc. v. United States, 5 Cir., 322 F.2d 576 (1963).

In Smoot Sand & Gravel Corp. v. Commissioner, 4 Cir., 274 F.2d 495 (1960), after summarizing the applicable statutory provisions,[4] Judge Sobeloff said:

" * * * Thus, the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves, for specific, necessary business needs.* Again, to

* 'In this connection, we think it appropriate to reiterate what was said in our earlier opinion in this case:
  " 'It is not necessary for a corporation to create surplus reserves on its books to cover its future business needs, as the petitioner here did. The Statute imposes no such evidentiary requirement, nor is the mere book entry conclusive, in a Section 102 case, that the reserve is for a reasonably anticipated business need.' [Smoot Sand & Gravel Corp. v. Commissioner] 4 Cir., 1957, 241 F. 2d 197, 207."

the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to

3. Sec. 534, I.R.C.1954, provides a method by which the taxpayer in a proceeding before the Tax Court may shift the burden of proof to the government with respect to the issue of whether or not earnings and profits have been permitted to accumulate beyond the reasonable needs of the business. This procedure is not open to a taxpayer who sues for refund in the District Court, because

it is not adapted to such a proceeding. See R. Gsell & Co. v. C. I. R., 2 Cir., 294 F.2d 321 (1961).

4. Provisions dealing with the accumulation of earnings have been in the income tax law since 1921. Most of the controlling authorities deal with previous statutes, particularly sec. 102 of the 1939 Code. Sec. 102(a) was similar to present sec. 532(a), sec. 102(c) to sec. 533(a).

its business, the corporation may accumulate surplus with impunity. Lasser and Holzman, Corporate Accumulations and Section 102, 93 (1949) and cases cited therein. Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonably foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the shareholders." 274 F.2d at 500, 501.

In the case at bar, the surplus— paid-in surplus and earned surplus accumulated during prior years and during the tax years in question—was represented principally by cash and securities unrelated to Fenco's business. It

amounted to $800,000, and was far in excess of the immediate business needs of the corporation. Fenco argues, however, that the surplus was justified by the reasonably anticipated business needs of the corporation, particularly the construction of buildings to be rented to suitable tenants, if and when they could be found, and possible future improvements to existing buildings. Corporate reserves may properly take such objectives into account, if the plans are definite and specific, and their execution is not postponed indefinitely.

The applicable regulations under the 1954 Code dealing with the "reasonably anticipated needs" referred to in sec. 537 are set out in note [5] below. The legislative history of sec. 537 is also important in this case. The relevant portion of Sen. Rep. No. 1622, 83d Cong., 2d Sess., p. 69 (1954), is set out in note 6. Both the

5. Treasury Regulations on Income Tax (1954 Code), § 1.537–1(b) provides:

"(b) *Reasonable anticipated needs.*

"(1) In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified on the grounds of reasonably anticipated needs of the business.

"(2) Consideration shall be given to reasonably anticipated needs as they exist on the basis of the facts at the close of the taxable year. Thus, subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of the taxable year if all the elements of reasonable anticipation are

present at the close of such taxable year. However, subsequent events may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated. In this connection, projected expansion or investment plans shall be reviewed in the light of the facts during each year and as they exist as of the close of the taxable year. If a corporation has justified an accumulation for future needs by plans never consummated, the amount of such an accumulation shall be taken into account in determining the reasonableness of subsequent accumulations." 26 C.F.R., sec. 1.537–1(b).

6. "One of the principal reasons for confusion as to application of the section 102 tax has been the lack of adequate standards as to what constitutes the reasonable needs of the business. Some of the standards informally employed in the past, such as the distribution of 70 per cent of earnings, have been erroneous or irrelevant. More often, in the absence of adequate guidance, revenue agents in examining cases have applied their individual concepts as to business needs.

"As a result some improper criteria developed which have led to criticism of the tax on unreasonable accumulations. One such principle is the so-called immediacy test, under which there must be an immediate need for the funds in order

regulations and the legislative history support the conclusion that an accumulation cannot be justified on the ground of reasonably anticipated needs of the business where the future plans are vague and indefinite or where execution of the plans is postponed indefinitely. See also Smoot Sand & Gravel Corp. v. Commissioner, 4 Cir., 241 F.2d 197, at 202; Dixie, Inc. v. Commissioner, 2 Cir., 277 F.2d 526, 527 (1960); American Metal Products Corp. v. Commissioner, 8 Cir., 287 F.2d 860 (1961).

The fixed assets of Fenco at the beginning of the two-year period involved in this case were:

(1) The building at 2401 N. Charles Street, rented by Chesapeake Cadillac, of which Fenton and his wife owned 96.8% of the stock; (2) the property at York Road and Susquehanna Avenue, in Towson, at one time occupied by Chesapeake Cadillac, then leased to Marsden Chevrolet; and (3) the property at 210 West 29th Street, leased to General Electric Supply Company. There is no evidence that any of the foregoing properties needed substantial improvements in 1958 and 1959 or would need such improvements in the foreseeable future.

(4) The vacant lot at Maryland Avenue and 25th Street. In 1955, Fenco spent some $11,000 on plans for a building on this lot, and tried to find a tenant or tenants for the projected building. The efforts were completely unsuccessful and became increasingly desultory; Fenco was looking for a purchaser as early as 1957, and sold the land in April 1959, just before the end of the second taxable year in question.

(5) The property at 2411 N. Charles Street, which was then improved by two buildings: an old building leased to the Department of Health, and a new building in the rear leased to Chesapeake Cadillac. Fenco knew as early as 1954 that the Department of Health would move to new quarters not later than 1959. The officials of Fenco were hoping that they might be able to find a tenant for the old building, and let it stand for a year after the Department of Health moved out. The old building was razed in the summer of 1960 to save real estate taxes, and the front of the property, 2411 N. Charles Street, has been used as a parking lot ever since. Fenco spent no money on any plans for a new building.[7] Although the officials of Fenco have excellent connections, and they and their real estate brokers were in touch with many concerns which later became tenants of buildings built for them in the same neighborhood or elsewhere, Fenco has never found a tenant with whom it could make an acceptable agreement for the construction and rental of a building at 2411 N. Charles Street.

Fenco's real estate broker was looking for a purchaser for the property as well as for prospective tenants; the directors of Fenco considered two or more offers to purchase the property in 1957, but placed a prohibitively high price on it. Since Fenco seems to have acquired most of its properties with a view to their possible future use by Chesapeake Cadillac, it seems probable that in the absence of

---

to justify the retention of earnings. In some cases section 102 was applied even though the corporation had definite plans for expansion and the *bona fides* of the expansion program were not in question.

"In order to eliminate the immediacy test, both the House and your committee have expressly provided in the statute that the reasonable needs of the business shall include the 'reasonably anticipated' needs of the business. It is contemplated that this amendment will cover the case where the taxpayer has specific and definite plans for acquisition of buildings or equipment for use in the business. It would not apply where the future plans are vague and indefinite, or where execution of the plans is postponed indefinitely." U.S.Code Cong. and Adm. News 1954, p. 4701. See Pelton Steel Casting Co. v. Commissioner, 7 Cir., 251 F.2d 278, at 281 (1958).

7. The only plans ever prepared were rough sketches drawn by Consolidated Engineering Co. on speculation in 1959, after the end of the second taxable year, when Blue Cross was considering this property.

a particularly attractive offer Fenco is willing to hold the front part of 2411 N. Charles Street for possible future use by Chesapeake Cadillac, which now occupies the building on the rear portion of that property and the building on the property immediately to the south, 2401 N. Charles Street.

(6) In 1957 Chesapeake Cadillac had leased from Bob Fleigh, Inc., the property at 242 West 29th Street, with an option to purchase that property and the adjoining property (which Fleigh had leased to Universal Motors) at the end of five years for $300,000. Chesapeake Cadillac wanted to use all or part of the Fleigh properties for its service operations, which were then being carried on at a much greater distance from 2401 N. Charles Street. Chesapeake Cadillac obtained permission from Fleigh to assign the option to Fenco, but did not do so until the fall of 1961, when Fenco purchased the property for $304,500. No improvements of any magnitude were contemplated or made.

■ At the beginning of the two years in question Fenco had liquid assets, representing capital, paid-in surplus and surplus earned during previous years, not only in excess of the immediate needs of the business, but also in excess of any reasonably anticipated needs of the business. Aside from the plan to spend $300,000 to purchase the Fleigh properties, plans for the future use of Fenco's funds were vague and indefinite. No other land purchase and no specific building project was then contemplated. The evidence of Fenco's own witnesses shows that if Fenco ever embarks upon a building operation of the nature discussed by its directors it will be able to borrow most of the money needed therefor. The Court does not suggest that a corporation may never accumulate earnings for the purpose of financing prospective expansion or improvements without borrowing. In this case, however, the plans with respect to future needs were too vague and in-

definite to justify the accumulations. See the authorities cited above.

The small investments in Fenco Auto Lease and Fenlease, totaling $30,000, were not likely to require and did not require any further investment by Fenco. They did provide Fenco with an opportunity to invest profitably a part of its liquid funds in short term obligations, but such financing could easily have been obtained elsewhere by those corporations.

The total liabilities of Fenco on April 30, 1957, April 30, 1958, and April 30, 1959, were in each instance between $60,000 and $65,000, of which $57,000 to $61,000 represented income taxes; the other liabilities amounted to only about $3,000 or $4,000. The current assets as of those three dates increased from $784,789 to $801,504 to $849,511; the earned surplus increased from $161,242 to $217,499 to $275,583; and the net worth from $1,147,574 to $1,203,831 to $1,285,815.

Net earnings after taxes for the year ended April 30, 1958 were $60,000; for the year ended April 30, 1959, $68,000. Dividends of $10,687.50 were paid in 1958 and $10,462.50 in 1959.[8]

■ The redemption of the Lowndes' stock had no business purpose and is inconsistent with the alleged need to accumulate. It is a factor which should be considered in determining whether the accumulations were beyond the reasonable needs of the business, although the redemption of the stock, standing alone, would not justify the imposition of the tax. Mertens, Law of Federal Income Taxation, § 39.35; Mountain State Steel Foundries, Inc. v. Commissioner, 4 Cir., 284 F.2d 737 (1960).

After considering all the evidence, including the amount of previously accumulated surplus, the purchase of the Lowndes' stock, the large investments unrelated to the corporation's business, the ratio of liquid assets to liabilities, the ratio of net earnings to dividends, the fact that the claimed plans for building

8. The difference was due to the fact that in 1958 Fenco had purchased from W. Bladen Lowndes, Jr., his 1,800 shares of stock for $26,100.

were vague and indefinite, and that no such construction has even been undertaken, together with other relevant factors, the Court finds that Fenco has not proved that the accumulations were not in excess of the needs of the business. On the contrary, the evidence shows that the accumulations were in excess of the needs of the business, including the reasonably anticipated needs of the business.

## II.

■ It is, therefore, incumbent on Fenco to prove by a preponderance of the evidence that the accumulations during the years in question, 1958 and 1959, were not made for the purpose of avoiding the income tax with respect to its shareholders.

■ The meaning of the words "the purpose" as used in sec. 532(a) and sec. 533(a) is not entirely clear. The Courts seem to be agreed that, to make the accumulated earnings tax applicable, the purpose to avoid the income tax with respect to shareholders need not be the sole purpose of the accumulations. The Courts are not agreed as to whether it need be the dominant or primary purpose; the weight of authority is that it need only be one of the "determinating" purposes. That expression was used in World Publishing Co. v. United States, 10 Cir., 169 F.2d 186, at 189 (1948), and in Kerr-Cochran, Inc. v. Commissioner, 8 Cir., 253 F.2d 121, at 123 (1958).

The Second Circuit in Trico Products Corp. v. Commissioner, 137 F.2d 424, 426 (1943), and the Fifth Circuit in Barrow Manufacturing Co. v. Commissioner, 294 F.2d 79, 82 (1961), have stated that it is not necessary to find that the "primary or dominant" purpose of the accumulation was the avoidance of taxes. Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086 (1943), supports this conclusion. See also Mertens, op. cit., § 39.26.

On the other hand, the First Circuit, in Young Motor Co. v. Commissioner, 281 F.2d 488, 491 (1960), said that the test is "the primary or dominant purpose" which led to the decision".

It has not been necessary for the Fourth Circuit to state explicitly its position on this question, but Judge Soper's opinion in Semagraph Co. v. Commissioner, 4 Cir., 152 F.2d 62 (1945), indicates clearly that avoidance of income tax with respect to the stockholder need not be the sole purpose of the accumulation, and does not indicate that it must be the dominant purpose. See also Smoot Sand & Gravel Co. v. Commissioner, 4 Cir., 241 F.2d 197 (1957) and 274 F.2d 495 (1960).

Fenton admitted that the high tax rate of any dividends paid to him by Fenco was a factor in the decisions to accumulate the earnings aside from the modest dividends paid in 1958 and 1959. He testified, however, that it was a minor factor. Two of the directors of Fenco, Lowndes and Wrightson, testified that Fenton's income tax was not a factor which they considered in deciding whether to accumulate the earnings or declare them as dividends. Wrightson testified that if Fenton's taxes were mentioned it was only "in a kidding way". The Court cannot believe this testimony. Both Lowndes and Wrightson were friends of Fenton and were also directors of Chesapeake Cadillac. Fenton's income was such that any additional dividends would have been taxable to him at a rate of more than 70%. Fenton and his wife owned more than 95% of the stock of Fenco. No doubt other factors were considered by the directors, although it is hard to believe that the president of the fastest growing savings bank in Baltimore and the president of two small banks and two savings and loan associations really did not believe in borrowing money to construct buildings to lease to specific tenants.

■ After carefully weighing all of the testimony, and all of the other evidence, the Court finds that Fenco has failed to prove by a preponderance of the evidence that the avoidance of income tax with respect to its stockholders was

not a "determinating" purpose. On the contrary, the Court finds that it was a primary and dominant purpose.

Judgment will be entered in favor of the defendant, with costs.