AMERICAN TRADING AND PRODUCTION CORPORATION

v.

UNITED STATES of America.

Civ. A. No. 70-1266-M.

United States District Court,
D. Maryland.

April 25, 1972.

John S. McDaniel, Jr., and Lawrence A. Kaufman and Cable, McDaniel, Bowie & Bond, Baltimore, Md., Carolyn E. Agger, Walter J. Rockler, Steven P. Lockman, and Arnold & Porter, Washington, D. C., for plaintiff.

Edward J. Snyder, Atty., Dept. of Justice, Washington, D. C., George Beall, U. S. Atty., and Michael E. Marr, Asst. U. S. Atty., Baltimore, Md., for defendant.

## OPINION *

JAMES R. MILLER, Jr., District Judge.

This case is a suit by American Trading and Production Corporation,* * a Maryland corporation, against the United States of America to recover the sum of $1,238,446.65, consisting of an accumulated earnings tax of $387,387.32, plus interest of $130,793.63 for the calendar year 1963, plus an accumulated earnings tax of $563,751.34 and interest thereon of $156,514.36 for the calendar year 1964, which amounts were paid by the plaintiff to the United States of America on or about October 31, 1969.

Jurisdiction is conferred by 28 U.S.C. Section 1346(a)(1); and venue is proper in this court under 28 U.S.C. Section 1402(a)(2).

The case has been well prepared and tried by counsel, and this fact has been of great assistance to the court in determining the issues in this case.

This being an accumulated earnings tax case, it is decided basically on its own facts. The cases state the issues in such a suit, to recover taxes paid, which were imposed under Section 531, revolve primarily around the facts and circumstances in each case. No hard and fast rule can be stated which applies in every situation.

The court adopts the proposed findings of fact, which I will enumerate in a moment, to the extent that such proposed findings of fact do not conflict with any express finding which I make in this oral opinion.

The court adopts, as its findings of fact, the following, which are taken from, except to the extent amended, the plaintiff's proposed findings of fact and the government's findings of fact.

The court adopts findings of fact from the plaintiff's proposed findings of fact Nos. 1 through 17; the court adopts government's proposed finding No. 16; plaintiff's proposed findings Nos. 18 through 27, and plaintiff's proposed finding No. 28 with the amendment at the beginning of the next to the last sentence of that finding, plaintiff's No. 28, the court inserts the following language: "By the period of 1963–64." The rest will read as set forth therein.

The court adopts further plaintiff's proposed findings Nos. 29 through 45, and adopts plaintiff's proposed finding No. 46 with this amendment, that at the end of the sentence which reads "At the end of 1964 Atapco's total investment in Charles Street Development Corporation was $794,806"; the court adds the following: "of which $90,406 was paid in capital for stock."

The court further adopts plaintiff's proposed findings Nos. 47 through 53. The court adopts government's proposed findings Nos. 34, 35, and 39. The court adopts plaintiff's proposed findings of fact numbered 54, 55, 56, and 56(a) through 66.

The court adopts plaintiff's proposed finding No. 67, with the amendment in the next to the last sentence by insertion of the word "probably" immediately prior to the word "been" so that the sentence would read: "Also, some reduction

---

* This is an oral opinion delivered in open court on April 25, 1972.

** Sometimes referred to as "Atapco."

from market price would have probably been involved."

The court further adopts proposed findings of the plaintiff Nos. 68 through 74.

Section 531 of the Internal Revenue Code, Title 26 U.S.C., imposes a tax on the accumulated taxable income of certain corporations.

Section 532 of said Code provides that the tax applies to every corporation [with certain exceptions not here applicable] "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

■ In the court's view, the key words in this section and the essence of the tax are (1) "purpose of avoiding the income tax" and (2) "permitting earnings and profits to accumulate." Two elements are, therefore, essential for there to be a tax under Section 531, that is, the purpose of avoiding the income tax in respect to the shareholders and, two, an accumulation of earnings and profits as the vehicle for avoiding said tax.

Section 533 provides that if earnings and profits of a corporation are accumulated beyond the reasonable needs of the business of that corporation, the purpose of shareholder tax avoidance is presumed, but the presumption is rebuttable by a preponderance of the evidence to the contrary.

Section 535(a) of the Code defines accumulated taxable income as taxable income subject to certain adjustments less the sum of dividends paid deduction and the accumulated earnings credit. Subsection (c)(1) of Section 535 defines accumulated earnings credit in part as so much of the earnings and profits of the taxable year as are retained for the reasonable needs of the business.

Section 537(a)(1) defines reasonable needs of the business as including "rea-sonably *anticipated* needs of the business." (Emphasis supplied).

In every case, the recitation of the legal principles involved is easier than applying those principles to the facts. As previously stated, the facts are all important in each case of this type. The Supreme Court in United States v. Donruss has indicated that the purpose of the tax imposed by Section 531 is to compel the corporation to distribute any profits not needed for the conduct of its business so that, when distributed, the individual stockholders will become liable for taxes on the dividends received by them. (393 U.S. 297 at 303, 89 S.Ct. 501, 21 L.Ed.2d 495). The Court went on at 307, 89 S.Ct. at 507 to eliminate preexisting conflicts between the various circuits, by stating that the tax avoidance purpose necessary to a Section 531 tax need not be the ". . . dominant, impelling, or controlling" purpose of accumulations of earnings and profits.

Going now, in this case, to the ultimate findings, this court is of the view that there was no tax avoidance purpose within the meaning of Sections 531 and 532 in the actions of the plaintiff corporation in the taxable years 1963 and 1964.

The court's opinion, in this regard, is reached after consideration of the various exhibits, stipulations and items of testimony presented during this case as well as the arguments of the respective parties. It is important, in the court's view that Atapco, during the period of at least 1958 through 1962, had a record of a consistent policy of paying dividends to its stockholders. The record is irrefutable, and, in fact, it is admitted by the government that no Section 531 tax could have been imposed for the tax years 1958 through 1962 for the reason that in each of those years there was a loss under Section 535.

In 1958, a dividend of $648,518 was paid, although for the purposes of Section 535, there was a loss of $1,129,493.

Similarly, in 1959, the dividend was paid of $376,842 with a Section 535 loss of $1,817,850.

In 1960, a dividend was paid of $367,027, although there was a Section 535 loss of $1,750,503.

In 1961 and 1962, the same dividend was paid in each of those years, with the Section 535 losses respectively being for those years, $578,387 and $2,931,226. These dividend payments in those years had the effect of substantially increasing the income taxes of the stockholders of Atapco for those years.

In addition, it is noteworthy that no loans were outstanding to the stockholders of Atapco at the end of the tax year 1963 or at the end of the tax year 1964. To the contrary, the corporation owed its stockholders approximately $300,000 at the end of 1963, which sum remained substantially unpaid at the end of the tax year 1964.

Also, it should be noted that during those years of 1963 and '64, there were no investments of corporate earnings and profits earned in those years in assets or businesses unrelated to the business of Atapco.

Additionally, there is the uncontradicted testimony of Dr. Morton Blaustein, now the president of the corporation, and the vice president thereof, during the years in question that tax considerations to the shareholders did not play a part in determining the payment of or amount of dividends paid by the corporation.

■ The court recognizes the principle expressed in many cases that the self-serving statements of stockholders or corporate officers are not necessarily determinative of the issue of purpose in a Section 531 case. However, where the objective facts are consistent with the testimony of those persons who participated in and are most thoroughly conversant with the decisions which are in issue, such testimony should be taken into consideration by the court in reaching its ultimate conclusion.

Dr. Blaustein testified that decisions on dividend payments were reached near the end of each taxable year, primarily and exclusively, on two criteria. The first was the needs of the business and the second was the needs of the stockholders, substantially all of whom were members of the same family.

In his testimony, Dr. Blaustein explained that there were some members of his family who depended on dividend income from the tax paying corporation for living expenses. This testimony is consistent with the facts that dividends were paid even in years in which there were taxable losses which would have allowed the corporation with tax impunity to have ignored the payment of dividends. As a matter of fact, some argument was made by the plaintiff with apparent merit that the shareholders of Atapco would, in fact, have had a lesser tax liability if no dividends had been paid by Atapco in the years 1958 through 1962, and had, instead, been paid in the years 1963 and 1964, with, of course, no resulting 531 liability as has previously been set forth to Atapco. Whether or not this is true the court does not pause to determine finally, since it believes other factors heretofore set forth are determinative of the "purpose" issue.

■ The "purpose" issue is at once an independent consideration in a Section 531 case, and at the same time is involved with the issue of accumulated taxable income. This is so because an accumulated earnings credit is allowed against accumulated taxable income under Section 535(a). The accumulated earnings credit, basically, is the amount of earnings and profits for any taxable year which are retained for the reasonable needs of the business, including reasonably anticipated needs of the business. Without accumulated taxable income, there can be no Section 531 tax. So, the existence of the amount of the reasonable needs of the business is crucial in determining whether or not there is an accumulated taxable income. It also, in this court's view, is relevant to the is-

sue of "purpose." If the purpose of the accumulations, if any, of earnings and profits is to meet the reasonable needs of the business exclusively, it cannot be for the purpose of avoiding tax on the shareholders of the corporation. While not necessarily determinative of the "purpose" issue, therefore, this court believes that the facts relating to the reasonable needs of the business are relevant and, in this case, support the conclusions of the court concerning the purpose of whatever accumulations of earnings or profits there was in the taxable years 1963 and 1964.

■■ In examining the question of the reasonable anticipated needs of the business the court has borne in mind the principle expressed in the Regulations and the cases, that the taxpayer must have specific, definite and feasible plans for the use of the earnings and profits which it accumulates or, more properly stated, retains. It is well established, however, that the earnings and profits retained by the taxpayer need not be used immediately if there are, in fact, definite plans for the use of the funds for business purposes in the reasonable foreseeable future. The intention of the corporation, through its policy-making officials, must be present in the taxable year in question to utilize the retained earnings and profits for the business needs, and it is not sufficient to defeat the tax of Section 531 that an expenditure in subsequent tax years is viewed in retrospect as having been planned in the prior tax year in question.

The controlling principles which this court should apply in the matter of the reasonable needs of the business were well stated by Judge Sobeloff in Smoot Sand & Gravel Corporation v. C. I. R., 274 F.2d 495 (4th Cir. 1960), as follows:

". . . the size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves, for specific, necessary business needs. Again, to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. (Citations omitted). Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonable foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the stockholders." 274 F.2d at 500–501.

Judge Sobeloff further stated, in Smoot Sand & Gravel Corporation v. C. I. R., 241 F.2d 197 at 207 (4th Cir. 1957):

". . . Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors."

Judge Sobeloff, in Smoot Sand & Gravel Corporation v. C. I. R., two much cited opinions in this area, has set forth the common sense principle that to the extent accumulated earnings and profits of a corporation have been invested in business assets and properties without a tax avoidance purpose, they are not available for the current needs of the business, and are not required to be paid out in any one taxable year as dividends, or to meet the current needs of the business in that taxable year, in order to avoid Section 531 liability.

In this case, the record shows that the taxpayer's tangible properties and equipment at the beginning of the year, taxable year 1963, amounted to approximately $13,000,000 in book value.

As of that same time, the taxpayer's total accumulated earnings and profits amounted to less than $10,000,000. At

that time, Atapco had a net working capital of $1,226,362.11, and a ratio of current assets to current liabilities of approximately 1.4 to 1. This does not, of course, take into consideration the market value of the stocks of Indiana, New Jersey, Crown Central, Union Trust, and USF & G, about which more will be said in a moment.

The accumulated earnings and profits of prior years were invested in business properties and were not reflected in cash or liquid assets. During the years 1963 and '64, and in each of such years, Atapco expended, in the acquisition of assets, more than the cash or cash equivalent which it received in those years, and more than its current earnings and profits in those years. Atapco expended in 1963 and '64 more than its cash receipts by in excess of $3,000,000. In those years, it also expended more than its earnings.

At the end of 1964, the taxpayer had specific, definite, and feasible plans which constituted reasonably anticipated future needs of the business which had to be and were, in fact, taken into account by the corporate officials in determining the future course of the business and in deciding upon its dividend policies in those years, that is, in the years 1963 and 1964.

The tanker fleet, at the end of 1964, was essentially outmoded and in need of replacement or reconstruction. A decision was made, the court finds on uncontradicted and undisputed testimony borne out by what in fact subsequently occurred, as set forth in the findings of fact, that the corporation would remain in the tanker business which necessitated the expenditure of very large sums of money. From all the evidence, the court believes that at the end of 1964 there were reasonably anticipated needs in this regard of at least $5,000,000.

In reference to the oil and gas production department of the taxpayer, there was evidence that for business purposes unrelated to this tax case, each year, there were prepared budgets and projections of future expenditures for the purposes of that department. The court believes and finds that there were reasonably anticipated future needs at the end of 1964 in· that department of at least $5,000,000.

In the real estate operations of the corporation, the court believes that at the end of 1964, there were reasonably anticipated future needs of at least $1,-800,000 being approximately $400,000 for the Dinkler property; $300,000 for the Americana property; $1,000,000 for the Wilshire property, and $100,000 for the second building in the Charles Center, which was commenced in 1969. Subsequent events, as the findings of fact show, prove that the actual expenditures exceeded substantially the figures adopted by the court herein.

The court has taken into consideration that future earnings must properly be considered in determining the reasonably anticipated future business needs at any given moment, and the court, in arriving at its conclusions, has given effect to its belief that it was anticipated in 1963 and 1964 that future earnings would account for part of the future expenditures reasonably foreseen at the end of those respective years, and, in fact, future earnings did account for part of the expenditures.

The court further finds that at the end of 1964, it was reasonably anticipated that the Atlas Company a part of the manufacturing division of Atapco would account for a reasonably anticipated future need of approximately $800,-000, a point not seriously contested by the government. The court does note, at argument, it (the government) made some point of the lack of direct evidence on whether or not the amount actually expended by Atlas for the acquisition and construction of a replacement plant was borrowed or paid from other sources, but the court adopts the position of the plaintiff that in every other case where borrowing was involved, the amount of said borrowings, or percentages of total expenditures which were borrowings, have been set forth in this record, and that it was not set forth in this instance

because there was no borrowing. In addition, witnesses were available for cross examination by the government on this point, but the government did not choose to examine thereon.

A large part of the testimony and exhibits in this case revolved around the stockholdings of the taxpayer in Indiana, Jersey, Crown Central, Union Trust, and USF & G. At the outset, the court notes that the government, while not conceding the ultimate issues in this case, has indicated to the court that USF & G involves a minimal amount and does not affect the ultimate outcome of this case one way or the other in tax consequences.

Accordingly, the court, unless otherwise indicated, will ignore USF & G, and deal with the other stockholdings. As the court understands it, the real position of the government in this case is that the stockholdings of Atapco—and, whenever stockholdings hereafter is used, unless otherwise indicated, I mean Indiana, Jersey, Crown Central, and Union Trust—were available at all times to the taxpaying corporation for any reasonably anticipated business need of the corporation, and that any earnings and profits from business operations or dividends on said stockholdings should have been at least in large part paid out in dividends to the taxpaying corporation's shareholders, rather than be expended for the acquisition of capital or other assets of Atapco, or for the repayment of existing indebtedness.

No case has been cited to the court, nor has the court found a case on all fours with this proposition.

The government argues that the entire financial situation of a corporation must be reviewed to determine whether or not the retention of earnings is for a tax avoidance purpose, or whether or not the reasonably anticipated needs of the business require the expenditure of current earnings and profits. With this proposition, this court does not disagree.

■ However, the purpose of the Internal Revenue Code Sections in issue, in this court's view, relate to earnings and profit and the size thereof, if any, and not to original capital and the size or growth thereof.

■ Without earnings and profits, there can be no Section 531 tax, irrespective of the size of the original capital account, or the liquidity of the capital.

■ While the entire picture of the taxpaying corporation must be considered, this court does not think that that principle means that original capital, in the form held in this case, must be so used as the basis for borrowing the entire current needs of the business, or otherwise exclusively relied upon for current needs or reasonably anticipated needs in order to escape a Section 531 tax.

The findings·of fact show that the Jersey, Crown Central, and Indiana—and particularly Indiana—holdings are essentially the original capital of the corporation derived directly from mergers, stock dividends and other actions involving the original stock conveyed to Atapco as original capital in 1931. It is not contended by the government, so far as this court knows, that Atapco was originally formed in 1931 for the purpose of avoiding a tax on its shareholders.

■ Essentially, what has happened is that the original capital in the form in which it is now held has explosively increased in value, but that fact alone is not sufficient in this court's view to require the liquidation of any part of that capital to meet current business needs in order to avoid a Section 531 tax.

It might be said, at this point, that the payment of stock dividends to Atapco shareholders in New Jersey, Indiana, and the other corporations would not, as suggested by the government, resolve the problem presented here. The facts demonstrate conclusively that the basis for all of the stock is very much less than the actual market value of said shares, assuming they could be marketed at or near the rate quoted in the Exchanges, or over the counter at any time.

At the end of 1964, the stock in issue had a market value based upon the then market prices in the respective Exchanges or over the counter of in excess of $100,000,000. Under the government's theory, however, in view of Regulation Section 1.562–1 that entire vast sum, available to the corporation for the purpose of being utilized by it for business needs or as the basis for borrowing, would be substantially dissipated in one or two years if paid to Atapco shareholders as stock dividends since the amount of the dividends paid deduction with respect to such stock would be the adjusted basis of the property in the hands of the distributing corporation at the time of the distribution.

Such a result could not possibly, in this court's view, be the intent of either Congress or the Internal Revenue Service in preparing the Regulations.

As a matter of fact, the taxpaying corporation has utilized, in the past, one-half of the stockholdings directly for the purpose of securing monies borrowed for corporate purposes.

This court does not believe the law requires or allows the court to say to the taxpayer that it must directly utilize for borrowing the other one-half, rather than part of the earnings and profits of any year in order to escape the Section 531 tax.

From a business point of view, as was testified by Mr. Friedman, it obviously makes good business sense to retain such capital holdings to allow favorable borrowing terms whether or not the stock is directly pledged and to provide enhanced opportunities for business expansion and development.

In addition to all of the aforegoing conclusions expressed, relating to the stockholdings, the court notes that there was substantial evidence that the stockholdings, including that in the Union Trust Company, were not readily saleable and were subject to varying problems which would be met, or probably would be met, under the Securities & Exchange laws and regulations in a liquidation or sale of the same. The insider rules might well have been applicable to Union Trust Company stock, not to mention Indiana, on whose board sat Jacob Blaustein, President of Atapco, and from all the evidence in the case, a major figure in Indiana.

The percentages of ownership by Atapco in Crown Central and Indiana would very likely have required registration of any sales by Atapco of its stockholdings therein, in addition to other securities law related problems about which there was testimony which might have arisen.

In short, the court finds that the aforesaid stocks in the hands of Atapco, under the then existing circumstances, in 1963 and 1964 were obviously not as liquid as they would have been in the hands of the ordinary person or corporation, and that they were not reasonably available for the needs of the business. The sale of the same, aside from all of the other business reasons mandating against the sale, would have resulted in the loss of approximately 25% of the entire amount of the sale in capital gains taxes in addition to whatever other discounts would have been required by virtue of the special circumstances of the taxpayer corporation and its involvement in the shares.

For all of these reasons, the court finds that these shareholdings were not available as readily liquid assets which the law might require be disposed of to meet current needs of the business in order to escape a Section 531 tax.

The government has cited Fenco, Inc. v. United States, 234 F.Supp. 317 (D. Md.1964); and Semagraph Company v. Commissioner, Tax Court Memorandum Decision, P–H Memo T.C., ¶ 44,264 (1944), affirmed, 152 F.2d 62 (4th Cir. 1945), in support of its theory that the stockholdings of Atapco should have been utilized to meet current needs of the business with the resultant conclusion that a Section 531 tax is owed for the taxable years 1963 and 1964.

Suffice it to say that this court does not believe the facts of either of those cases approach the facts in this case, either as to the "purpose" issue or the "reasonable needs of the business" issue. In neither case was it necessary for there to be a finding that the original capital of the corporation, in whatever form then held, was required to be liquidated or otherwise disposed of to meet current or reasonably anticipated business needs. In both cases, the liquid assets in relation to current liabilities far surpassed the present case, and in both cases the liquid assets in addition to the original capital compared to current or reasonably anticipated liabilities was much more than here.

The dividend policies in those cases did not compare to that here.

While, as previously stated, it is true that the overall financial picture of a corporation must be considered in determining whether or not, and the extent to which current earnings and profits or accumulated earnings and profit must be utilized for needs of the business exclusive of dividends to be paid to the shareholders, each case, as previously stated, must be determined on its own facts and here the facts are vastly different from those cases cited by the government.

Without prolonging this opinion any further, the court finds ultimately as follows:

(1) The taxpayer was not formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed;

(2) The earnings and profits of Atapco were not permitted, in 1963 or 1964, to accumulate beyond the reasonable needs of the business;

(3) Prior to January 1, 1963, Atapco had expended amounts in excess of its retained earnings for assets in connection with its various businesses (other than its interests in other nonsubsidiary corporations) and did not have any assets available for payment of dividends without liquidating capital or borrowing;

(4) During each of the years 1963 and 1964, Atapco made actual expenditures for acquiring additional tangible assets and for other business purposes in excess of its cash earnings for such year plus its non-cash deductions and financed such expenditures in part by borrowing;

(5) For the year 1963, Atapco's accumulated earnings credit, within the meaning of Section 535(c) of the Internal Revenue Code of 1954 was not less than its accumulated taxable income in the sense of Section 535 less dividends paid for that year, and similarly for the year 1964;

(6) At the end of each of the years 1963 and 1964, the taxpayer had plans and requirements for large additional expenditures for its businesses as set forth in this opinion; and

(7) Atapco's interests in other companies were primarily its original and basic capital. Sale of part of Atapco's interest in other companies in 1963 or 1964 would have involved risks and problems as set forth in this opinion and would have been contrary to sound business practice. Such interests in other companies were properly held and retained as an integral part of its business and were utilized by Atapco as a base for borrowings for the needs of other parts of its business.

In view of the court's findings as to those issues, it is not necessary to decide other issues originally presented. The court reaches the ultimate conclusion for the reasons stated herein that the plaintiff is entitled to judgment for the sum of One Million Two Hundred Thirty-Eight Thousand Four Hundred Forty-Six Dollars and Sixty-Five Cents ($1,238,446.65) paid by it, together with interest thereon from October 31, 1969, as provided by law.

Plaintiff's counsel are requested to prepare an appropriate judgment in conformity with this opinion after the same

has been reviewed for form by counsel for the government.

## APPENDIX

### PLAINTIFF'S PROPOSED FINDINGS OF FACT ADOPTED BY THE COURT

1. The plaintiff is American Trading and Production Corporation, a Maryland corporation, hereinafter and in the pleadings and the record variously referred to as "the plaintiff," "the taxpayer," "Atapco," or "American Trading." The defendant is the United States of America, hereinafter and in the pleadings and the record variously referred to as "the defendant," "the United States," or "the government."

2. The present suit is brought by the plaintiff against the defendant under the Internal Revenue Laws of the United States to recover the sum of $1,238,446.65, consisting of accumulated earnings tax of $387,387.32 and interest thereon of $130,793.63 for the calendar year 1963 plus accumulated earnings tax of $563,751.34 and interest thereon of $156,514.36 for the calendar year 1964, which amounts were paid by plaintiff to defendant prior to assessment and without notice or demand on or about October 31, 1969.

3. Plaintiff duly filed on or about March 17, 1970 timely claims for refund of the taxes and interest it has so paid. These claims were disallowed by the defendant and no part of the amounts sought to be recovered by the plaintiff has ever been refunded to the plaintiff.

4. Plaintiff is the sole owner of the claims for refund and has made no assignment thereof. No questions have been raised as to jurisdiction and venue, and this court has jurisdiction over this suit.

5. Atapco was incorporated on June 23, 1931. On March 7, 1932, it issued 22,000 shares of its capital stock to Louis Blaustein, who received 16,500 shares, and his son, Jacob Blaustein, who received 5,500 shares, in exchange for 10,335 shares of the Class B stock of The American Oil Company (hereinafter called "American"), 123 shares of the Class B stock of Lord Baltimore Filling Stations, Inc. (hereinafter called "Lord Baltimore"), and a controlling interest in Crown Central Petroleum Corporation (hereinafter called "Crown"). The value of these securities at the time of the exchange, as fixed by the Board of Directors of Atapco, was $5,593,319.

6. Louis Blaustein and his son, Jacob Blaustein (hereinafter and in the record sometimes referred to as "the Blausteins"), had incorporated American and Lord Baltimore in 1922 and 1921, respectively, and had transferred to these corporations in exchange for all of the capital stock of each, the businesses of selling kerosene and gasoline which the Blausteins had previously been conducting.

7. At the time of their organization neither American nor Lord Baltimore possessed crude oil products, refineries or pipelines and American was purchasing its entire supply of gasoline from its largest competitor, Standard Oil Company of New Jersey (hereinafter and in the record sometimes referred to as "Jersey"), under a contract scheduled to expire on December 31, 1923.

8. In 1923, the Blausteins sold to Pan American Petroleum and Transport Company (hereinafter and in the record referred to as "Pan Am"), one-half of the stock that they held in American and Lord Baltimore for a total consideration of $750,000. The stock so sold consisted of 20,700 shares of Class A stock of American and 250 shares of Class A stock of Lord Baltimore and the stock retained by the Blausteins consisted of 20,700 shares of the Class B stock of American and 250 shares of the Class B stock of Lord Baltimore. As a part of this transaction Pan Am caused its subsidiary, Mexican Petroleum Corporation to enter into a contract to supply the entire gasoline requirements of American and Lord Baltimore until December 31, 1933. Pan Am and Mexican Petroleum Corporation had large crude oil reserves,

three refineries and extensive transportation facilities.

9. Between 1923 and 1930 more than 95% of the outstanding stock of Pan Am was acquired by Standard Oil Company (Indiana) .(hereinafter and in the record referred to as "Indiana"). In 1930, a dispute arose between American and Pan Am regarding the price payable by American under the 1923 contract and Pan Am threatened to refuse to supply American with gasoline. Also, in 1930 the Blausteins, on behalf of American, obtained an option to acquire a controlling interest in Crown which owned facilities which, by the expenditure of substantial sums for improvements, could have taken care of American's regular gasoline requirements. The Pan Am members of the Executive Committee of American refused to permit American to acquire Crown. In November, 1930, the Blausteins personally acquired the controlling interest in Crown which was subsequently transferred to Atapco.

10. At about this time, Pan Am proposed to sell to Jersey its foreign refineries, crude oil ·properties, and tankers. Under threat of a suit by Atapco and the Blausteins to enjoin this sale, Pan Am and its principal stockholder, Indiana, entered into an agreement binding themselves to preserve the integrity of American and to permit it to acquire its own refining capacity and a supply of crude oil. Thereafter there were continuing negotiations, which ultimately resulted in a contract, executed on February 17, 1933 (dated as of January 1, 1933), pursuant to which American acquired ·all of the stock of Lord Baltimore, Pan Am acquired all of the stock of American, and Atapco and the Blausteins acquired 1,286,876 shares of Pan Am, being approximately 27.35% of the issued stock of Pan Am, with 641,925 shares being issued to Atapco, 483,422 shares being issued to Louis Blaustein and 161,529 shares being issued to Jacob

Blaustein. Three Million Two Hundred Ninety-Two Thousand Two Hundred Ninety-Seven and 88/100 (3,292,297.88) shares (approximately 70%) of the capital stock of the reorganized company were held by Indiana and the balance of 123,770.686 shares were held by others.

11. The 1933 contract provided that for a minimum of four years, Louis Blaustein and Jacob Blaustein would be, respectively, President and First (Executive) Vice President of Pan Am and Chairman of the Board and President of American. Additionally, the contract provided that so long as Atapco and the Blausteins held certain quantities of stock of Pan Am they would be entitled to a specified representation on the Boards of Directors and Executive Committees of Pan Am, American, and their subsidiaries.

12. Following unsuccessful litigation in the New York state courts which was commenced in 1937 and concluded in 1944 Atapco and the Blausteins brought an action on April 17, 1945 against Indiana for breach of contract, which litigation was terminated upon a merger on August 17, 1954 of Pan Am into Indiana. The following table shows the number of shares of Pan Am which were held by Atapco, Jacob Blaustein, and the executors of the estate of Louis Blaustein (who had died in July, 1937) at the time of the merger and the shares of Indiana acquired in exchange therefor:

| Stockholder | Shares of Pan Am Held | Shares of Indiana Acquired |
|---|---|---|
| Atapco | .670,325 * | 520,843 |
| Jacob Blaustein | 141,129 | 109,657 |
| Estate of Louis Blaustein | 92,360 | 71,764 |

The 520,843 shares of Indiana so acquired by Atapco in 1954 were subsequently increased to 2,083,372 shares as a result of a 100% stock dividend in 1954 and a two for one split in 1964. To the extent that Jacob Blaustein and

* Comprised of 641,925 shares originally acquired in 1933 for shares of American and Lord Baltimore and 28,400 shares acquired between 1934 and 1948.

the executors of the Estate of Louis Blaustein continued to hold the shares of Indiana which they acquired as a result of the merger, the number of shares held by them also increased because of such stock dividend and split.

13. The taxpayer has continuously held its Indiana shares since the time of their original acquisition in the merger in exchange for the shares in Pan Am, which had in turn been held by the taxpayer from the time of their acquisition by the taxpayer. During the years 1963–1964 the taxpayer was the largest single stockholder of Indiana, holding 2.94 of the stock of Indiana. In addition, members of the Blaustein family owned about another one percent, so that the total holdings were about 4%.

14. The taxpayer has also continuously held its shares of stock in Crown from the time of their original acquisition. During the years 1963–1964, the taxpayer was the largest single stockholder of Crown, holding 48.8% of the outstanding stock of Crown. An additional 2% approximately was owned by stockholders of American Trading who were members of the Blaustein family.

15. At some time during the 1930's Indiana sold some foreign oil properties to Jersey for cash plus shares of Jersey stock, and during the period from 1940–1945 owned 6.78% of the outstanding Jersey stock. During the period from 1948 through 1963 Indiana distributed shares of the Jersey stock held by it as dividends on Indiana stock, and in 1954, when Atapco acquired shares of Indiana in exchange for the shares of Pan Am, Indiana held 2.43% of the Jersey stock. As a result of these distributions by Indiana of Jersey stock and the exercise of stock rights in 1957 Atapco held during 1963–1964 a total of 148,159 shares of Jersey stock, of which 9,058 were received in 1963, 9,058 were received in 1962, 17,361 shares were received in 1961 and 112,682 shares were received prior to 1961.

16. During the years 1963–1964 Atapco owned 28,710 shares of stock of Union Trust Company of Maryland, all of which, with the exception of 836 shares acquired in 1961 as a stock dividend, were acquired prior to 1961, and which were about 5% of the outstanding stock of Union Trust. An additional approximately 6% of the outstanding stock of Union Trust was owned by members of the Blaustein family and the combination of Atapco plus the family stockholders was by far the largest stockholder in Union Trust.

17. During the years 1963–1964 Atapco also owned 4,422 shares of U. S. Fidelity and Guaranty Co., all of which had been acquired prior to 1961 for $53,343 with the exception of 402 shares which were acquired as a stock dividend in 1962. This was a very small interest which in 1963–1964 had a value of approximately $200,000 to $300,000.

18. At the end of both 1963 and 1964 Atapco owned 450 of the 900 shares of the Class A Capital stock of Charles Street Development Corporation, which had been organized in 1960 or 1961 pursuant to a joint venture between Atapco and McCloskey, which was a builder and developer of real estate in Philadelphia. The other 450 shares of Class A Capital stock of Charles Street Development Corporation was owned by Blaustein Industries, Inc., the Capital stock of which was owned by Jacob Blaustein, his children and grandchildren and two Foundations. The 900 shares of Class B Capital stock of Charles Street Development Corporation were owned by McCloskey. For a period of time during 1962 and 1963, Atapco's interest in Charles Street Development Corporation was held indirectly through American Trading Corporation as an interim measure because of technical problems.

19. During 1964 Atapco also owned the stock of Wilshire Properties, Inc., a wholly owned subsidiary which held a leasehold interest on land in Los Angeles; Belvedere Petroleum Corporation; and Kromex Corporation.

20. There were interlocking directorships and other relationships between Atapco and the several corporations in

which Atapco had interests. Officers, directors and employees of Atapco actively participated in the management and direction of these corporations, as hereinafter more specifically detailed.

21. Jacob Blaustein was the President and a Director of Atapco during the years involved in this case, as well as prior thereto. During this period, he individually held 14,970 shares (8.02%) of the outstanding 185,310 shares of the Class A Voting Common stock, was the sole trustee of trusts which he had created in 1932 for the benefit of his wife and children and which held 55,000 shares (29.68%) of the Class A Voting Common stock, was one of the trustees of other trusts which had been created in 1953 by him, his sisters (Ruth B. Rosenberg and Fanny B. Thalheimer) and his mother (Henrietta Blaustein) for the benefit of Jacob's, Ruth's and Fanny's children and which held 57,300 shares (30.92%) of the Class A Voting Common stock and, in 1964, was one of the trustees of a trust which had been created by the Will of Fanny B. Thalheimer and which held 8,803 (4.75%) of the Class A Voting Common stock. In 1963 and 1964, he ran the company and set top company policies.

22. At the time of the merger of Pan Am into Indiana and as a result of agreements in connection therewith, Jacob Blaustein became a director of Indiana for a period of one year. He resigned as a director on August 17, 1955, exactly one year after the date of the merger. Thereafter, on September 12, 1955 he was reelected as a director of Indiana and was reelected in all subsequent years through 1970, when he died. Initially, he was the only outside director or one of two outside directors. Over the years the number of outside directors increased and ultimately there were six outside directors, of whom only Jacob Blaustein was a representative of a large shareholder.

23. Jacob Blaustein regularly attended the meetings of the Indiana Board of Directors. In 1954 and for several years thereafter the Board met in Chicago each Monday. Subsequently the number of meetings was reduced to every other week and after a number of further years, the number of meetings was reduced to once a month.

24. Jacob Blaustein was also a member and sometimes Chairman, of various committees of Indiana which were established for specific purposes, such as committees to study employee benefit plans. He would also meet frequently with other directors, officers and other executives of Indiana and particularly with its Chief Executive Officer, both in Chicago and elsewhere to discuss both major policy matters and matters pertaining to the operation of Indiana business. Among the kinds of matters which were so discussed were financing, the annual advertising program, whether to stop manufacturing unleaded gasoline, entry into production in areas other than the United States and Canada, diversification, including efforts to acquire other companies by merger, changing the designs of trademarks and dividend policies. Various officers and employees of Atapco assisted Jacob Blaustein in connection with his decisions on Indiana matters.

25. American Trading has always had one of its officers as a Director of Crown. Additionally, Henry A. Rosenberg, Jr., who is associated with Crown and is currently its President, was a Director of Atapco during the years 1963–1964 and prior thereto, Atapco and Crown were represented by the same law firm which has usually had one representative on the Atapco Board and two representatives on the Crown Board.

26. Jacob Blaustein had been a Director of Union Trust Company since the 1930's and was a Director during 1963–1964. He was also a member of the Advisory Committee which is a "select" committee of five Directors who with the top management of the bank meet a number of times each year to consider major policy matters before they are submitted to the Board of Directors. Since Jacob Blaustein's death, Morton K. Blaustein has been a member

of the Advisory Committee. In 1964, Morton K. Blaustein, who was then a Vice President, Treasurer and Director of Atapco, became a Director of Union Trust and following the death of Jacob Blaustein, Henry A. Rosenberg, Jr., the President of Crown and a Director of American Trading, also became a Director of Union Trust. Practically every important problem concerning the affairs of Union Trust was discussed by officers of the Bank with Jacob Blaustein while he was living, with Morton K. Blaustein after he became involved and subsequent to Jacob Blaustein's death, with Morton K. Blaustein and Henry A. Rosenberg, Jr. The matters discussed included, dividend policies, merger policies, opening of branches and similar transactions.

27. The taxpayer first became engaged in the marine transportation business in 1938 when it acquired a vessel (the "Pennsylvania Sun" renamed the "American Trader") in order to meet Crown's requirements for transportation. This vessel was requisitioned by the United States Government at the beginning of World War II, but was subsequently returned to the taxpayer for operation as agent for the government. The taxpayer, during World War II, acted as general agent for War Shipping Administration and operated as many as fourteen vessels in addition to the "American Trader". After the end of World War II the taxpayer acquired additional tankers and diversified its marine transportation activities to include the transportation of crude petroleum, specialty chemical products, vegetable oils, molasses and grain, in addition to finished petroleum products.

28. During the period from the end of World War II through 1953 the taxpayer acquired six tankers for a cost (including capital improvements) of approximately $8,250,000, a part of which was paid in cash and a part of which was represented by long term financing, all of which was repaid by 1964 with $76,830 being repaid in each of 1963 and 1964. Four of these tankers were T–2 type tankers [1] built during World War II prior to 1945 which were purchased by the taxpayer in used condition from the United States. The other two tankers were 13,000 ton vessels which had been built prior to 1940 and which were purchased from Esso in used condition in 1953. By the period of 1963–64 all of such tankers had been utilized extensively by the taxpayer and the previous owner in carriage of finished petroleum products and were approaching the end of their useful lives in such service. In order to continue the business of carrying finished petroleum products it was necessary for Atapco either to acquire additional tankers (either newly built or which, although used, had not been used as extensively as the taxpayer's tankers in clean service i. e., in carrying finished petroleum products) or to rebuild its existing tankers.

29. In December, 1956 and January, 1957 the taxpayer spent approximately $5,700,000 (including the cost of capital improvements) in acquiring two additional used tankers (the SS "Washington Trader" and the SS "Virginia Trader") from the United States. Both of these vessels had been built during World War II. Approximately $3,420,000 of this cost was borrowed, all of which was repaid by the end of 1963. The taxpayer also in 1956 studied the feasibility of "jumboizing" one or more of its existing tankers by installing a new mid-body (which contains the cargo tanks) so as to increase cargo carrying capacity and enable the vessel to continue in clean service. In the latter part of 1956 Atapco contracted for the jumboizing of two of its T–2 tankers. One such jumboizing was completed in 1958 at a cost of approximately $3,500,000 of which approximately $2,600,000 was borrowed. The amount so borrowed was repayable at the rate of $174,151 per year.

---

[1]. A T–2 tanker is a war built 16,000 ton tanker with a speed of approximately 14½ knots and a capacity to lift about 138,000 barrels of product.

At the end of 1962 the unpaid balance of this borrowing was $1,882,073. Tanker freight rates dropped to very low levels in 1957 and the second jumboizing was cancelled in that year.

30. In 1956 the taxpayer sold its two oldest tankers (the two smaller tankers which had been acquired in 1953) to a foreign subsidiary (Calvert Tankers) for $2,800,000. These two vessels were laid up in the following year, 1957, and in 1962 were sold for scrap. At the time they were sold they were economically inoperable.

31. Tanker freight rates are subject to extreme fluctuations both from year to year and during each year. Such rates are normally expressed in terms of a percentage over or under the United States Maritime Commission rates (USMC) or the American Tanker Rate Schedule rates (ATRS). The USMC rates are a schedule of rates which were originally published by the USMC during World War II, when all United States flag tankers were operated by the Commission and were intended to avoid discrimination in the charges for movements between different ports. The ATRS rates are a similar schedule prepared by the Association of Ship Brokers and Agents, Inc. after the Commission ceased publishing changes in the USMC rates. The average of the reported rates prevailing during a full year have ranged from a high + 106% for clean petroleum products and + 99% for dirty petroleum products in 1951 to lows of −29% and −36%, respectively, in 1949. The variations during particular years have been even greater. In 1956 the rates for clean petroleum products varied from a low of −10% in March to a high of + 260% in December. These variations in tanker freight rates occurred because of changes in the demand for tank vessels both seasonally and as a result of world events, such as the closing of the Suez Canal in 1956.

32. Similarly, there were large variations in the net earnings of the taxpayer's Marine Department. During the years 1951 to 1957 the net earnings of such Department, as computed before any charges for general (i. e., headquarters as distinguished from Marine Department) overhead and administration expenses varied from a low of $815,944.-18 in 1954 to a high of $4,502,839.59 in 1957. Atapco's Marine Department had net losses, as so computed, before deducting general overhead and administration expenses, during each of the years 1958 to 1962 in amounts ranging from a loss of $65,642.96 in 1961 to a loss of $822,748.90 in 1960, and aggregating $2,594,398.65 during these five years. In 1963 and 1964 the net earnings of the Marine Department, as so computed, were $254,793.55 and $801,667.01 respectively.

33. In 1960 the taxpayer purchased an additional World War II built tanker at a cost, including capital improvements completed in 1961, of approximately $500,000. In 1961 one of the taxpayer's tankers became inoperable and was sold as scrap. In 1962 two more of the taxpayer's tankers became inoperable and were sold as scrap. As a result of these dispositions at the end of 1962 and throughout 1963 Atapco's fleet was comprised of only four vessels, consisting of the SS "Maryland Trader" (which had been jumboized in 1958) and three other vessels which had been built during World War II, which had been purchased by the taxpayer in used condition, and which by the end of 1962 were between 18 and 22 years old. These latter three vessels consisted of the SS "Crown Trader" (purchased in 1960), the SS "Washington Trader" (purchased in 1956) and the SS "Virginia Trader" (purchased in 1957). The undepreciated cost of these vessels at the end of 1962 and 1963 was $10,550,886. As of December 31, 1962 three of these vessels were pledged as collateral on preferred ship mortgages in the unpaid principal amount of $2,750,329.73. Under the terms of the mortgages $965,578.00 was required to be paid in 1963, leaving an unpaid balance of $1,784,751.73 on De-

cember 31, 1963, and $250,981.00 was required to be paid in 1964, leaving an unpaid balance of $1,533,770.73 as of December 31, 1964, which had to be paid in annual installments of $174,151.00 each year thereafter until 1973, when the entire balance would fall due.

34. The average life of a T-2 tanker in dirty service (i. e., carrying crude oil bunkers and residual oil and not subject to the corrosive effects of clean petroleum products and the constant cleaning of tanks) is about 20 years. The life of a tanker which is used in clean service is much less. In the years prior to 1963 American Trading had carried predominately clean products. The SS "Maryland Trader" had been used constantly in clean service since 1958 and had bulkheads which required coating or other steps to arrest corrosion. The other three vessels were in very poor condition and unless some action was taken American Trading would have been phased out of business because of the condition of the vessels. Accordingly, the Marine Department and Atapco's management considered a number of alternative solutions.

35. Among the alternatives was to build two new 24,000 ton vessels to replace the three 16,000 ton vessels at a cost of approximately $16,000,000 to $17,000,000. Another alternative was to build three new 27,000 ton vessels at a cost of about $28,000,000 to replace both these three vessels and the two vessels which had been scrapped in 1962. Another alternative was to jumboize existing vessels or purchase sterns for jumboization to create 27,000 ton vessels at a cost of from $4,500,000 to $5,000,000 each. Still another alternative was to buy used vessels at a cost from $350,000 to $700,000 each which, with the expenditure of an additional $400,000 to $500,000 for capital improvements and betterments, would serve Atapco's purposes for from 4 to 8 years. The costs of these various solutions ranged from a low of approximately $2,300,000 for a minimum program of replacing only the three smaller vessels by the purchase of

used vessels of similar size to a maximum of approximately $28,000,000 if the three smaller vessels plus the two which had been scrapped in 1962 were replaced by three new 27,000 ton vessels. Unless one or another of these alternative programs was adopted the Marine Department would have been unable to continue to operate for more than a year with the possible exception of the SS "Maryland Trader".

36. The program which was decided upon and adopted by Atapco in 1964 to meet the problems presented by the condition of its fleet was a combination of the alternatives of buying used vessels similar in size to the existing three smaller vessels and which, with capital improvements, would have a life of from 4-8 years, plus jumboizing one or two vessels at a cost of approximately $5,000,000 each, which would have an estimated life of 15 years.

37. This program was immediately put into effect. In 1964 Atapco purchased a used vessel (the "Neches", renamed the "American Trader") at a cost, including capital improvements, of $676,827. In 1965 it acquired another used vessel (the "Alaskan", renamed the "Baltimore Trader") for $375,858, spent $485,815 for coating the tanks and installing heating coils on the SS "Maryland Trader" and arranged to secure two new mid-bodies for installation in the SS "Washington Trader" and the SS "Virginia Trader". The mid-body for the "Washington Trader" was installed in 1965 at a cost of $383,134, and the mid-body for the "Virginia Trader" was installed in 1966 at a cost of $454,383, including a $30,000 down payment in 1965. Additionally, in 1966 Atapco contracted for the jumboization of the "American Trader" (ex "Neches") into a 27,000 ton vessel, and this work was completed in 1967 at a cost of $4,429,385. Also in 1967 the tanks of the "Washington Trader" were coated at a cost of $302,787. In 1968 the tanks and decks of the "Virginia Trader" were coated at a cost of $513,073. In 1969 another ship (the "Texaco South Caroli-

na", renamed the "Texas Trader") was purchased for $300,000 and jumboized into a 27,000 ton vessel at a cost of $4,913,630.

38. Concurrently with the carrying out of this program, the taxpayer scrapped the "Crown Trader" in 1965 and in 1969, disposed of the "Baltimore Trader" (ex "Alaskan"), which had been acquired in 1965 to replace the "Crown Trader", with the consequence that at the end of 1969, the taxpayer's fleet consisted of five vessels. These were the "Maryland Trader", which had jumboized in 1958 and which had been further improved in 1965 and 1969; the "Washington Trader" and the "Virginia Trader", to which mid-bodies had been added in 1965–1966 and which had been further improved in 1967, 1968 and 1969; the "American Trader", which had been jumboized during 1966–1967; and the "Texas Trader" which had been acquired and jumboized in 1969. The total cost of carrying out this rehabilitation of Atapco's fleet, including miscellaneous capitalized expenditures, was $13,054,689.

39. $6,000,000 of the amounts so expended were secured by borrowings which were collateralized by mortgages on the two jumboized vessels and assignments of freight revenues earned by the vessels, and the balance of over $7,000,000 was provided from other funds of Atapco.

40. In addition to carrying out the above program, which essentially merely replaced the tonnage as it existed before 1962, the taxpayer in 1969–1970 contracted for the acquisition and jumboization of another vessel (the "P. W. Thirtle") renamed the ("Baltimore Trader") into a 58,000 ton vessel. This transaction was completed in 1971 at a total cost of $12,967,872, of which $8,500,000 was borrowed.

41. Atapco has been engaged since 1944 in a program of acquiring undeveloped oil and gas leases, primarily in Texas, New Mexico and Louisiana, and in drilling and developing these leases.

In 1964, this program was expanded through the formation of a wholly-owned subsidiary to engage in oil exploration and production in Canada. At the end of 1963 and 1964, Atapco owned leases covering approximately 108,500 acres and 103,100 acres respectively. It had a field office in Midland, Texas, and subsidiary offices in Abilene, Texas, and Lafayette, Louisiana. During 1963–1964 it had approximately 15 employees in its Oil and Gas Division consisting of a Manager of Operations who was located in the State of Texas, staffs of geologists and engineers and stenographic and other clerical personnel. The corporate supervision of this Division was vested in a Vice President of Atapco who was located in Baltimore, Maryland, and also supervised the Marine Division.

42. During the years 1960 through 1964, Atapco's revenues from the sale of crude oil, gas and by-products varied between approximately $1,600,000 and approximately $1,760,000. During these same years, its profit per year from the producing leases varied from slightly over $500,000 to almost $700,000 after deducting amortization, depletion and depreciation which ranged from approximately $650,000 per year to $700,000 per year, but before deducting overhead expense or any charges for abandonments, geophysical expense and dry hole contributions. After deduction of these last mentioned expenses, the operations of this Division resulted in net losses in each of those years in amounts ranging from approximately $500,000 to approximately $1,100,000. These losses in each year were before giving any effect to capital expenditures in such year for drilling and equipping wells and acquiring acreage, but were after giving effect to amortization, depreciation and depletion and abandonments in respect of such expenses which had been incurred in prior years. Atapco's expenditures for drilling and equipping wells and acquiring acreage were $755,331.00 and $2,040,745.00 in 1963 and 1964 respectively.

43. Atapco regularly prepared a capital expenditures budget for its Oil and Gas Division near the close of each year for the ensuing year. Additionally, at or about the close of each year, a survey was made of all of the leases held by Atapco, classifying such leases into various categories and making estimates of (1) the costs of drilling and equipping the wells necessary fully to develop the leases on which production had been secured and (2) the costs of drilling only on leases which were not producing, but which warranted drilling a well or wells for the purpose of determining whether the acreage should be held or let go.

44. The approved Oil and Gas Division budget for 1963 was $970,000, of which $814,900 was spent. The approved budget for 1964 was $1,750,000 and the actual expenditures charged against this budget were approximately $1,800,000. At the end of 1964, the estimated cost of drilling and equipping the wells necessary to be drilled fully to develop the acreage held by production was approximately $5,500,000. Additionally, the estimated amount necessary to drill exploratory wells to evaluate leases on which production had not been secured and which were deemed worthy of evaluation (as, for example, because a successful offset well had been drilled) was approximately $1,960,000. The taxpayer did not expect to drill all of these wells in a single year. In 1965 and 1966, the taxpayer expended approximately $1,768,000 and approximately $1,920,000 in drilling and equipping wells and for other exploratory expenses. The actual expenditures for drilling only in 1967 and 1968 were approximately $1,796,000 and $1,145,000 respectively.

45. Because of the cyclical nature of the marine business and in order to build an earnings base which would exist whether or not it became successful in oil and gas, Atapco decided to diversify by acquiring manufacturing businesses and by entering into real estate projects. David Hirschhorn was employed by Atapco in 1958 to seek out businesses which could be acquired, and the first manufacturing business was acquired in November, 1961. In the meantime, Atapco had entered into the real estate business in 1960–1961 through the joint venture with McCloskey mentioned previously.

46. Atapco's initial real estate venture (Blaustein Building—Charles Street Development Corporation) involved the simultaneous acquisition of several parcels of land in Baltimore, extending along Charles Street between Baltimore and Fayette Streets with a depth of about 132 feet along Fayette Street. The initial development was limited to about 15,000 square feet, on which the Blaustein Building was built, although existing improvements on other portions of the property were demolished. The first building involved an equity expenditure by the participants of about $1,500,000. At the end of 1964 Atapco's total investment in Charles Street Development Corporation was $794,806.00, of which $90,406.00 was paid in capital for stock. Beginning in 1962–1963 and continuing thereafter plans were pursued for development of the balance of the land through the location of key tenants and erection of a second building. Further development was necessary because this property was incurring net costs of about $50,000 per year after reduction by income received. The estimated costs of putting up an additional building were from $10,000,000 to $12,000,000, of which about 75% could have been borrowed. A second building was ultimately erected and at the time of the trial was about 52% tenanted.

47. In 1964 Atapco acquired, through a wholly-owned subsidiary, Wilshire Properties, Inc., a long-term ground lease on about 73,000 square feet of land in Los Angeles, California, for the purpose of erecting two office buildings. The cost of the leasehold was $210,200, the ground rent was $112,125.00 per year plus real estate taxes and other expenses and the net cost of holding the property was between $70,000 and $80,000 per year. Atapco immediately

started plans for the first office building at an estimated cost of $5,000,000, of which 75% could be borrowed. The building was started in 1966 and subsequently completed in 1968 at higher than projected costs, and the total actual equity of Atapco in the project was approximately $1,900,000.

48. On December 11, 1964 the taxpayer contracted to purchase the Dinkler Motel in Atlanta, Georgia for $1,600,000, of which $400,000 was payable at the closing on February 19, 1965 and the balance was represented by mortgages. In early 1965 Atapco also acquired the Americana Apartments in Dallas, Texas, pursuant to negotiations which were conducted in 1964, at an equity cost of approximately $350,000.

49. On October 31, 1961 Atapco purchased all of the assets of Atlas Sound Corporation for approximately $1,600,-000, subject to current liabilities, of which approximately $1,000,000 was paid in cash and $600,000 was represented by notes payable at $120,000 per year through 1966. The principal products of Atlas Sound were horn-type loud speakers, microphone stands and related products. It prospered, with sales reaching approximately $1,750,000 in 1963 and $2,250,000 in 1964, which produced net earnings before taxes and general administration expenses of $259,327.71 and $494,241.45, respectively. Its business was conducted in leased premises in Brooklyn, New York. It became apparent that these premises were inadequate to handle the volume of business being done, and Atapco sought other premises which could be either leased or purchased. During 1964 Atapco decided that it was not feasible to lease and that it would be necessary to build at a cost of from $800,000 to $1,250,000.

The contract for the new plant was executed in August, 1965 and it was completed in 1966 at a cost (including land) in excess of $900,000.

50. On September 30, 1964 Atapco purchased for $4,150,000 all of the assets of the Kromex Corporation, of Cleveland, Ohio, which was a leading manufacturer of quality line aluminum and chrome plated kitchenware and aluminum, chrome plated and wooden giftware. This acquisition was financed by a short-term borrowing which was followed by long-term financing. During the three months ended December 31, 1964 the Kromex Division of Atapco produced net earnings before taxes of $234,571.87.

51. Both Atlas Sound and Kromex were acquired for the purposes of improving earnings, for the growth of the business and to provide diversification.

52. In 1963 Atapco's net cash receipts from earnings plus non-cash deductions, such as depreciation were $3,939,001.93.[2] During that year its expenditures for fixed assets and in payment of pre-existing long-term debt and dividends plus advances to subsidiaries aggregated $4,401,580.80.[2]

53. In 1964 Atapco's net cash receipts from earnings plus non-cash deductions, such as depreciation, were $4,848,532.69.[3] During that year its expenditures in acquiring the assets of Kromex Corporation, for other fixed assets for investments in and advances to subsidiaries and in paying dividends were $7,911,988.95.[3] Additionally, it made payments of $9,374,981.00 on bank borrowings and term indebtedness outstanding at the beginning of 1964.

54. As of December 31, 1962, immediately before the years involved in this

2. Neither of these amounts includes the amount of $299,882.94 which Atapco deducted as repair expense on vessels and which the Commissioner asserted should be capitalized. If the Commissioner is correct, both amounts would be increased by $299,882.94 and the difference would remain the same.

3. Neither of these amounts includes the amount of $263,375.37 which Atapco deducted as repair expense on vessels and which the Commissioner asserted should be capitalized. If the Commissioner is correct, both amounts would be increased by $263,375.37 and the difference would be the same.

case, Atapco's investment in fixed business assets (oil and gas properties, vessels and other property and equipment), net of depreciation, depletion and amortization, was $12,936,819.76, which was $3,327,161.03 greater than its earned surplus of $9,609,658.73. More than two-thirds of Atapco's book earned surplus consisted of the value of shares of Jersey stock which it had received from Indiana and which it regarded as part and parcel of its Indiana holdings, and Atapco's investment in "hardware" was more than $9,500,000.00 in excess of that part of its earned surplus which resulted from cash earnings. In addition, the taxpayer had other assets aggregating over $2,000,000.00, such as the amount it paid for Atlas Sound in excess of tangible assets, insurance claims and other sundry assets and net working capital. (Excess of cash, accounts receivable, inventory and prepaid expenses over current liabilities; current ratio 1.-4 to 1). This excess over amounts available from earnings had been financed by borrowings.

55. This pattern continued in 1963 and 1964. In 1963 the taxpayer's investment in oil and gas properties, vessels and other property, plant and equipment, net of depreciation, depletion and amortization, dropped by $1,474,056.45. However, this drop was more than offset by the $2,585,578.00 which the taxpayer paid on long-term debt in that year, and Atapco's net investment in such fixed tangible assets at the end of 1963 was still $975,102.08 in excess of its earned surplus of $10,487,661.23, two-thirds of which consisted of the Jersey shares being retained by the taxpayer as part of its original capital. During 1963 the aggregate of Atapco's accounts receivable, inventories, prepaid expenses, insurance claims and other miscellaneous assets increased substantially. Its current ratio dropped to 1.3 to 1 and, notwithstanding a bank borrowing of $1,000,000, its cash decreased by $170,696.92.

56. In 1964 there were very substantial increases in the assets of the taxpayer, primarily as a result of the Kromex acquisition. The net investment in property, plant and equipment increased by $2,376,224.94 from $11,462,763.31 to $13,838,988.25, and at the end of 1964 exceeded earned surplus by $1,165,048.-37. In addition, accounts receivable, inventory, prepaid expenses, advances, insurance claims and sundry assets also increased and the taxpayer paid more than $900,000.00 for the Kromex assets above the amounts allocated to tangible assets. Cash increased by $3,570,345.88, primarily as a result of a $15,000,000 long-term borrowing in December, 1964. Long-term debt (inclusive of current maturities) plus bank borrowings increased by $5,625,019.00 from $11,437,-926.75 at December 31, 1963 to $17,-062,945.73 at December 31, 1964. The difference of over $2,000,000 between the increase in debt and the increase in cash represents in substance, the amounts invested in business assets during 1964 which had to be provided from long-term borrowings over and above the amounts generated by cash earnings and non-cash deductions, such as depreciation, depletion and amortization.

56(a). As of December 31, 1964, the Government was asserting that Atapco owed the United States more than $5 million in principal amount of income taxes and accumulated earnings taxes for past years. The interest asserted to be due on these alleged tax deficiencies amounted, at the end of 1964, to approximately $2 million.

57. Atapco has regularly and recurrently borrowed large amounts of money to finance its various business activities. These borrowings have included mortgage borrowings (including deferred portions of purchase prices secured by purchase money mortgages) secured by mortgages on vessels and real property, long-term unsecured borrowings from financial institutions and medium and short-term unsecured borrowings from banks.

58. As of December 31, 1960 Atapco owed $2,000,000 which it had borrowed in December, 1960 from a bank on a

short-term basis, $6,500,000 which it had borrowed in 1959 on a long-term basis from a number of financial institutions, plus $4,843,182.85 secured by mortgages on vessels. On that date its current assets were approximately $300,000.00 less than its current liabilities. During 1961 the taxpayer borrowed $5,000,000 (repayable at the rate of $1,000,000 per year) from another bank, paid off the $2,000,000 short-term loan, issued $600,000 of five year notes in payment of the deferred part of the purchase price for the assets of Atlas Sound Corporation and made payments on its long-term indebtedness, so that on December 31, 1961 its indebtedness for money borrowed and deferred purchase price of assets acquired consisted of $5,000,000 payable to such bank, $6,000,000 payable on the 1959 loan, $600,000 payable on such purchase money notes and $3,896,219.03 secured by mortgages on vessels. On December 31, 1961 the taxpayer's current assets exceeded its current liabilities by approximately $3,550,000 and its current ratio was 2.1 to 1.

59. During 1962 the taxpayer did not borrow any additional monies, but did make the regularly scheduled payments of $1,620,000 on the 1959 borrowing, the 1961 bank borrowing and purchase money notes, plus $1,145,889.30 on mortgage debts on vessels, including the remaining balances on the two vessels which were scrapped in that year. At December 31, 1962 the excess of Atapco's current assets over its current liabilities was reduced to approximately $1,225,000 and its current ratio was only 1.4 to 1.

60. During 1963 the taxpayer borrowed $1,000,000 on a short-term basis from a bank and also made regular payments on its long-term indebtedness of $2,585,578, so that at December 31, 1963 the taxpayer's indebtedness for money borrowed and for the deferred portion of the purchase price of assets purchased consisted of the $1,000,000 short-term bank loan, $5,000,000 owing on the 1959 long-term borrowing, $3,360,000 owing on the 1961 bank bor-

rowing and purchase money notes and $1,784,751.73 owing on vessel mortgages. On that date the excess of the taxpayer's current assets over its current liabilities had been still further reduced to approximately $1,070,000 and its current ratio was 1.3 to 1.

61. In August and September, 1964 Atapco borrowed $5,000,000 from two banks, of which $1,000,000 was used to repay the 1963 bank loan and $4,000,000 was used in payment for the assets of Kromex Corporation. As a result of these borrowings and use of funds the taxpayer's current assets on September 30, 1964 were approximately $1,800,000 less than its current liabilities and its current ratio was only 0.8 to 1. In December, 1964 the taxpayer borrowed $15,000,000 from institutional lenders on terms which provided that amortization be not commenced until 1970. Concurrently with this borrowing Atapco paid off the remaining balance of the 1961 bank borrowing and the 1959 term borrowing, plus the $5,000,000 which had been borrowed from banks in 1964 and as a result of these transactions at the end of 1964 its indebtedness for money borrowed and deferred purchase price of assets consisted of the $15,000,000 borrowed in December, 1964, $240,000 owing on the 1961 purchase money notes and $1,533,770.73 owing on vessel mortgages. At December 31, 1964 the taxpayer's current assets were approximately $7,720,000 in excess of its current liabilities and its current ratio was approximately 5.0 to 1. This improvement in current position was primarily due to the facts that no part of the $15,000,000 borrowed in December, 1964 was repayable within the next year and accordingly includible in current liabilities and that the monies so borrowed included cash which was borrowed in anticipation of the expenditures which were subsequently made in connection with the taxpayer's fleet rehabilitation, Oil and Gas Division and other planned needs.

62. Atapco's policy with respect to the payment of dividends is to take into

account both the needs of the business for funds for its activities and the needs of stockholders for income. This policy has been followed consistently both in loss years and profit years. During the years 1958–1962, when the taxpayer had Section 535 accumulated taxable losses of more than $8,100,000 and accordingly had no need to pay out dividends to avoid the Section 531 penalty tax, it nevertheless paid out $2,124,441 in dividends. These dividends were paid notwithstanding that during these years the taxpayer borrowed very substantial amounts ($7,500,000 in 1959 and $5,000,000 in 1961, as well as a short-term borrowing in 1960) which could have been reduced if dividends had not been paid.

63. Atapco did not take into account in reaching its decisions as to dividend payments the taxes which would be payable by its shareholders or the effect on taxes payable by it. If Atapco had been so concerned, it could have eliminated all or substantially all the Section 531 penalty tax asserted against it for 1963 and 1964 without increasing the taxes payable by Jacob Blaustein (its controlling stockholder) on joint returns with his wife, Hilda K. Blaustein, by omitting the payment of any dividends in 1958–1962 and paying such dividends in 1963 and 1964. During the period from 1958–1962 Jacob Blaustein and his wife

received $414,169 [4] out of the $2,124,421 dividends paid by Atapco during those years. The taxes paid thereon were $358,158.00.[5] If Atapco had deferred payment of these dividends until 1963 and 1964, the taxes payable by Mr. and Mrs. Blaustein would have been slightly less and no Section 531 penalty tax would have been payable by the taxpayer.[6]

64. During the years 1963 and 1964, when Atapco's expenditures in connection with its business activities exceeded the aggregate of its cash income plus the cash generated by its non-cash deductions and it was borrowing money, the dividends paid by it were increased from the $367,027.20 paid in 1962 to $401,944.20 and $474,638.20, respectively.

65. The interests in other companies (other than subsidiaries and Charles Street Development Corporation) which were held by Atapco in 1963 and 1964 had been acquired many years prior thereto and had a low basis for determining taxable gain or loss in comparison to both quoted market values on stock exchanges and on the over-the-counter market and the prices for which they could be sold. By far the largest part of Atapco's interests in other corporations had been acquired either in exchange for or as distributions in respect of securities which it had acquired

---

4. This amount represents the dividends paid on stock held by Jacob Blaustein plus the 40% of the dividends paid to Jacob Blaustein, Trustee, which were payable to Hilda K. Blaustein.

5. The reductions in taxes have been computed for each year by taking the taxable income as reported for such year, deducting such dividends therefrom, computing the tax on such reduced income and subtracting such reduced tax from the tax actually paid. In making these calculations no effect has been given to adjustments for deductions, such as the charitable contribution deduction, which are limited to a percentage of adjusted gross income. The same procedure has been applied in reverse in calculating the additional taxes which would have been payable in 1963–1964.

6. The computations are complicated by reason of the disputed adjustments which were made to taxable income, and therefore to Section 535 Income, as determined by the Commissioner. If the taxpayer had paid out in 1963–1964 only that part of the 1958–1962 dividends necessary to offset its Section 535 taxable income per its returns as filed, $410,128 would have been payable to Mr. and Mrs. Blaustein, their additional tax would have been $327,281 and no Section 531 tax would have been payable. Even if these disputed adjustments are sustained the additional taxes payable by Mr. and Mrs. Blaustein would not have exceeded a maximum of $335,326 and the potential Section 531 penalty tax would not have exceeded $144,236.57.

as a contribution to its original capital in exchange for its own capital stock.

66. Sales of the interests which Atapco held in other corporations would have resulted in the incurrence of large capital gains taxes and a resulting shrinkage in its financial strength, except to the extent that such gains might be offset by losses. Because of the quantities of stock held, the circumstances under which the stock had been acquired, the relationships of stockholders, officers and directors of the taxpayer with such other corporations and the possession of "insider" knowledge, sales to the public would have involved various risks and problems, including risks of possible actions by purchasers and the Securities and Exchange Commission based on claimed failures to make full disclosures and otherwise comply with the Securities laws and risks of claims by the corporations involved if confidential information were disclosed. The availability of exemptions was questionable, so that it would have been necessary, or, at the very least, desirable, to have registered the securities or secured a "no-action" letter from the Securities and Exchange Commission, if possible, or to have made a private sale with an investment letter.

67. Registration is time consuming and involves large out-of-pocket expenses and may not be feasible at any given moment because of the necessity of making a full disclosure of material facts, including facts which the corporation whose securities are being registered may desire to keep confidential. Also, some reduction from market price would have probably been involved. Private sales subject to an investment restriction could have been made only at a large discount (30% to 50%) from generally prevailing prices.

68. Atapco never considered the sale of its interests in other corporations, because it regarded them as part and parcel of its business. It felt that it was preferable to use this stock as a base for borrowing, since it was a strong base

and was increasing in value. It understood that if it wished to sell it would incur a capital gains tax and that its holdings were not freely saleable. It desired to make the business grow, and use borrowings for this purpose. Atapco's opinion that these stocks should not be liquidated, but instead should be utilized as a borrowing base for further growth, was in accord with sound financial practice.

69. The utilization of Atapco's interests in other corporations as a base for borrowing was fully recognized in the loan agreements which it entered into in 1959 and 1964. Each of these agreements provided that (1) the quoted market values of these interests would be utilized in determining the amounts which could be borrowed by the taxpayer and (2) the taxpayer would not sell more than certain specified amounts of these securities unless it concurrently made payments on the amounts which were borrowed under the agreements.

70. On February 10, 1959, Atapco issued $7,500,000 of $5\frac{1}{4}\%$ sinking fund notes, due December 1, 1973, to ten institutional investors, and in connection therewith incurred expenses of $35,629.-70, which were capitalized and amortized over the life of the loans. On January 1, 1964, the unamortized balance of these expenses was $24,128.58. On December 15, 1964 Atapco borrowed $15,000,000 from seven institutional investors, consisting of some, but not all, of the lenders under the 1959 loan agreements. Under the terms of the 1964 loan agreements, certain of Atapco's notes under the 1959 agreements were surrendered by the holders thereof in payment of the 1964 loans, and others were called for redemption at a premium. The proceeds of the 1964 loans were required to be applied not only to payment of the 1959 loans, but also to payment of other indebtedness. Only one of the 1964 lenders loaned the same percentage of the 1964 loans as it had loaned of the 1959 loans, and there was no uniform relationship between the amounts loaned under the 1959 agreements and the

amounts loaned under the 1964 agreements. There were significant differences between the two loan agreements. The taxpayer expensed $2,177.34 as amortization of its 1959 note expense in the first 11 months of 1964, and wrote off the balance of $21,951.24 in December, 1964.

71. Under applicable statutes and regulations of the United States, the vessels owned by the taxpayer are required to be periodically inspected by the United States Coast Guard and may not lawfully be operated unless the Coast Guard has issued a certificate showing the vessel currently to be in good condition and repair. Under the terms of the insurance policies insuring the vessels, it is necessary that such vessels be periodically inspected by representatives of the American Bureau of Shipping and that such Bureau issue its certificates showing that such vessels continue to meet the applicable requirements of the Bureau. The United States Coast Guard certificate is issued every two years. However, an intermediate survey is required between the 12th and 14th month. The American Bureau of Shipping required annual surveys, with a more rigorous special survey every four years.

72. Some, but not all, inspections and surveys require that the vessels be placed on drydock for inspection of underwater parts. Drydocking is also required for the purposes of cleaning and painting and repairing any known underwater damage which has occurred. An inspection of a vessel by these regulatory bodies normally involves an opening up of various parts of the vessel and its equipment. Some parts, such as boilers, are required to be opened up annually. Other parts are required to be opened up at less frequent intervals. Such openings-up are required without regard to whether or not there is any apparent need for repair. A complete opening-up involves an expenditure of about $30,000 to $40,000.

73. In determining the taxable income (and, therefore, the amount of claimed accumulated taxable income) of Atapco for 1963 and 1964 the Commissioner of Internal Revenue determined that all amounts deducted by the taxpayer on its Federal income tax returns for such years are allowable as expenses with the exception of $299,882.94 in 1963 and $263,575.37 in 1964. These amounts covered work done with respect to three vessels in each of these years, $160,000.00 of such amount for 1963 and $105,616.22 of such amount for 1964 was for work done on the "Crown Trader" which became inoperable and was scrapped in 1965. It has been stipulated that the invoices, copies of which were filed as Exhibits, accurately describe the work which was done and the part of the invoice price applicable to each item of such work.

74. An examination of the invoices discloses that with the exception of one invoice for parts for a winch each invoice covered a large multitude of items. With the same exception each invoice provided for drydocking the vessel for inspection of the underwater parts, repair of any damage found, cleaning and painting and the opening-up of various parts of the vessel for inspection and repairing any items found to be worn out or defective. These invoices also disclose that a great deal of the work involved consisted of repairing cracks and leaks which had developed, cutting out parts of pipe, plates and bulkheads which had become defective and in one instance replacing a number of plates amounting to approximately 1% of the total steel in the vessel. Atapco's port engineer, who had supervised the performance of the work covered by these invoices, testified that all of the work which was done with the exception of the bottom painting and cleaning, was work which was required to prevent removal of the vessel's certificates, which would have prevented her from operating. He also testified that without exception all of the work was of types normally and frequently required to keep vessels in good operating condition and to meet inspection requirements and which nei-

ther prolonged the life nor enhanced the value of the vessels except in the sense that if the work had not been done the particular vessel would have been unable to continue to operate lawfully and would have prematurely become valueless. This testimony is not contradicted and is supported by the description of the work as contained in the invoices.

## GOVERNMENT'S PROPOSED FINDINGS OF FACT ADOPTED BY THE COURT

16. Since 1954, Atapco's dividends from Indiana have at times included stock in Standard Oil Co. (New Jersey). By 1963 and 1964 Atapco's holdings in Indiana and New Jersey had increased and it had acquired stock in Union Trust Co. of Maryland and United States Fidelity and Guaranty Co. Its securities at the end of 1963 and 1964 were as follows (in shares):

|  | 12/31/63 | 12/31/64 |
|---|---|---|
| Crown Central Petroleum Corp. | 402,851 | 402,851 |
| Standard Oil Co. (Indiana) | 1,041,686 | 2,083,372 |
| Standard Oil Co. (New Jersey) | 148,159 | 148,159 |
| Union Trust Co. of Maryland | 28,710 | 28,710 |
| U. S. Fidelity & Guaranty Co. | 4,421 | 4,421 |

The Union Trust and United States Fidelity and Guaranty were traded in the over-the-counter market; the other securities were traded on the New York Stock Exchange (Standard of Indiana and Standard of New Jersey) and the American Stock Exchange (Crown Central).

34. Atapco's balance sheets show earnings as follows for the years 1962, 1963 and 1964:

| 1962 | 1963 | 1964 |
|---|---|---|
| $637,771.95 | $2,066,446.70 | $2,660,916.85 |

These earnings are after receipt of dividends on the securities listed in par. 16, of

| 1962 | 1963 | 1964 |
|---|---|---|
| $2,893,967.48 | $3,194,898.16 | $3,382,098.13 |

35. The Securities listed in par. 16 were carried by Atapco on its books at

$13,922,751.35 in 1963 and $14,725,994.-65 in 1964. The total fair market value of these stocks at year end in 1963 and 1964 was $85,686,549 and $109,709,222, respectively.

39. Atapco paid no federal income taxes for the years 1962, 1963 and 1964 due to the availability of the dividends received credit and loss carryovers.